GEORGE KIMMIE v. TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, a Corporation, Appellant.—66 S. W. (2d) 561.

Division One, December 22, 1933.

*T. M. Pierce, J. L. Howell* and *Walter N. Davis* for appellant.

*Charles P. Noell, Charles L. Moore* and *Allen, Moser & Marsalek* respondent.

598

HYDE, C.—This is an action for personal injuries under the Federal Boiler Inspection Act, U. S. C. A., Title 45, Section 23. Plaintiff obtained judgment for $20,000, from which defendant has appealed. Plaintiff was an engineer operating one of defendant's switch engines. The facts about how he was injured are stated in defendant's brief as follows:

"The gravamen of plaintiff's petition is that a piece or part of the tread of the step on an engine, on which plaintiff was working was broken out, causing plaintiff's foot, as he climbed down said step, to become wedged therein in such a manner as to throw him to the ground and injure him.

"Plaintiff's evidence tends to show that on October 9, 1929, defendant was generally engaged as a railroad in interstate commerce, which defendant admitted. About three P. M., on said day, in the City of East St. Louis, Illinois, in defendant's Wiggins No. 2 Yard, as plaintiff was alighting from defendant's engine No. 178, to discontinue work for the day, although he knew and had known for a

long time that a portion of the tread of the sill step on said engine was broken out, he placed his right foot on the top step about the middle of the tread, and, with his left foot on the ground, the instep of his shoe slipped into the broken out portion of said step. Losing his balance and seeing that he was going to fall, he threw himself to the left as much as he could and that is all he knew, because on coming to his senses he was dazed. The step was on the right hand or west side of the engine, which was headed south. The lower step was four or five inches from the ground. The top step was around eleven inches or a foot above that. Plaintiff stated that his left foot was solid on the ground and that he had hold of the handrails at the same time. On cross-examination he said that his left foot slipped off, just as he went to step back, make his step, my foot caught in there; that he did not know what caused his foot to get in there. Plaintiff's Exhibits 'A' and 'B' show that (on October 6th and 8th, 1929) he reported that a piece broke out of step between engine and tank on right side. Plaintiff's evidence tends to show that he struck the lower part of his back and spine on a tie.''

Defendant contends that its demurrer to the evidence should have been sustained. It bases this upon its contention that there is no probative evidence in the record that the serious injury, of which plaintiff complained at the trial, was caused by the fall. Whether that is true or not, there was substantial evidence that plaintiff fell and sustained some injuries and that the broken sill step was a proximate cause of his fall. The demurrer to the evidence was therefore properly overruled.

Defendant's other assignments of error really go to the amount of the verdict. Plaintiff claimed to be suffering from a sarcoma, or cancerous bone tumor, of the ilium (about half the size of a hen's egg) extending into the sacroiliac joint. If the growth on the ilium was caused by the accident and was a sarcoma the verdict would not be excessive. [Capstick v. Sayman Products Co., 327 Mo. 1, 34 S. W. (2d) 480.] If, however, it was not a malignant bone tumor, or if, whatever the growth was, it was not caused by plaintiff's fall, the verdict would be greatly excessive. Defendant's contention here is, first, that there is no substantial evidence that the tumor is a sarcoma or cancerous tumor, and second, that there is no substantial evidence that the tumor was caused by plaintiff's fall.

The development of the tumor was related by Dr. Vezeau, who examined plaintiff the day after his fall and treated him thereafter. He said that, upon this examination, ''I didn't find anything outside of a little swelling, considerable rigidity; what I mean by 'rigidity' is over the lower spine and lower back there was a stiffness there, supposing there was some injury. . . . I put adhesive on the back

about ten inches over here, over to the point of soreness; we term that 'immobilization;' that is adhesive plaster, and a nerve sedative, and some anti-pain tablets, and sent him home." Dr. Vezeau said that he saw plaintiff three or four times a week after that and took a number of X-ray pictures. He said: "At the beginning I couldn't find no injury there; that is, in reference to the X-ray, I couldn't find no injury, outside of a little cloudiness in the joint. . . . A. That is what we found, a cloudiness. We presumed it was acute. And later on there was right above this bone here, there was a—under this swelling—there was a baggy formation, and I drawed out about three tablespoonfuls of clear fluid. I sent that to Grandwohl's Laboratory which we checked up on t.b. all the time from those fluids, and it come back negative, only that they found a lot of white blood cells."

This laboratory test was made January 22, 1930. Also in January, 1930, X-ray pictures of plaintiff were taken by Dr. Briggs. As to what he found then he said: "This is Exhibit 'C,' which is a picture of the lower lumbar vertebrae and the sacroiliac joints. There is no evidence of fracture here that I could see. There are traces of arthritis; that is, an inflammation of the joints. . . . Q. Doctor, on the plates you took prior to this (referring to the picture taken in December, 1930) you didn't—you stated you didn't find any such tumor as this; is that true, sir? A. No, there was nothing shown in the earlier plates. Q. In the earlier plates it is not there at all? A. No. Q. It has developed then since the taking of this picture? A. That developed since."

Dr. Vezeau testified as to the further development of the tumor as follows:

"Q. Since you have removed the fluid has the lump subsided or gone away? A. The soft swelling has, but since then there is a bony formation developed. Q. A bony formation? A. Yes, sir. Q. Has the lump progressed in size? A. Not with fluid—what I have drawn, that is soft, but there was another bone formation beginning from underneath, underneath and lateral, that would be right on the side here, but on the opposite bone, and there was a lump coming right out here. . . . Q. In reference now to the bony substance there, when did you first observe that condition? I am speaking about the—. A. (Interrupting): Well, that was a short while after, I guess several months after—after we drew the fluid."

In December, 1930, Dr. Briggs made another X-ray picture about which he said: "Here you see a decided mass, which starts at the periosteum, at the ridge of the crest of the ilium and extends downward just as though there were little rubber balls in there that somebody had blown up or filled with air. . . . It begins at the crest of the ilium and back over the left sacroiliac joint and it extends

downward from there, and it is just a typical tumor mass." As to what the tumor was, he testified on direct examination, as follows: "Do you know what that is, Doctor? A. That has the appearance of being a sarcoma—I am not certain of it. . . . That is my opinion, yes." On cross-examination he said this could be determined by microscopic examination and testified further as follows: "Q. And that is the only way to tell whether it is sarcoma or not? A. Well, it has the X-ray appearance of it, but once in a while you get a growth that looks like a sarcoma and it is not. Q. Yes. A. And that is why you have got to be a little bit hesitant, a little slow, in calling—to call the turn on it. It has the appearance. . . . Q. And you could only tell by a microscopic examination or inspection of it? A. I couldn't tell that then. The fellows that fool with these can tell it, or you can tell clinically, I presume the surgeons could make a diagnosis of that clinically, you know. Q. You mean by the appearance of it clinically? A. Yes, clinically; yes, the clinical appearance of it; yes. Q. And yet there are tumors of that nature that look like that, that are not malignant? A. Yes. I have seen one or two of those things that I rather believed was a sarcoma and it didn't turn out to be."

Dr. Vezeau gave on direct examination the following opinion as to the character of the tumor:

"As far as my knowledge, I think it is carcinoma. . . . Well, it is a bony tumor. . . . It may be carcinoma or cancerous, rather. . . . Basing my experience on this case, studying this case, it is malignant—a malignant tumor—cancerous." On cross-examination he testified further as follows: "Q. And you don't know, as a matter of fact, whether it is or not, do you? A. Well, according to our symptoms, as far as we know, it is malignant. . . . Q. But you say the only way you can determine is by cutting into it, and you have not cut into it yet? A. No, sir, we haven't cut into it. Q. And, therefore, you don't know whether it is; if you have not cut into it you don't know, do you? A. Well, we don't know that it is not a cancer. . . . Q. As a matter of fact, you don't know whether this is a cancer or not, do you? A. Well, no, I don't know, but I presume it is."

Dr. Henry, who also testified for plaintiff, first saw plaintiff in May, 1931. He testified as to the examination:

"We looked at it, and we felt it, and we questioned him as to the history of its origin and what had happened in his case prior to the time this tumor developed, in trying to determine some cause for its existence." He gave his opinion as to what it was, as follows: "Q. What it is first, Doctor, and then we will go ahead? A. It is a sarcoma of the ilium. Q. Yes. Now, Doctor, what is a sarcoma? A. It is a malignant growth; it is a malignant tumor, cancerous in char-

acter. . . . . It has taken the clinical course of sarcoma. . . . I couldn't help from forming an opinion from the history of the case, and it is my opinion that it is sarcoma." On cross-examination he testified further as follows: "Q. And that is the only way you can tell whether it is sarcoma, or not, by cutting into it? A. That is one of the ways. I have got another way. The man is progressive, losing weight, his tumor is progressive, growing larger, and all those things, and the manner in which he was hurt, had the bone injury, and the tumor developing at the time it did, all those symptoms lead me to believe that. Q. You don't know whether this is a sarcoma, or not, do you? A. I have every reason to believe it. Q. I know, but you don't know whether it is? A. No. And there is no living man can always tell. Q. No. A. Even with a microscope—they often make a mistake with a microscope. I have had the best pathologists in St. Louis make a mistake with the microscope. Q. And they often make mistakes, and it may be you are mistaken? A. Yes, it is possible I might be mistaken; I don't think I am infallible, but I have every reason to believe I am correct. . . . . He might get well, if it is not malignant it won't kill him. He would be a hopeless invalid if it was malignant. . . . It might be a chondroma or osteoma or fibroma, or something of that nature; you could remove a tumor of that type. . . . But I wouldn't undertake it, located as it is, even though it was a fibroma or an osteoma, or chondroma." He said that a sarcoma was "a malignant tumor, cancerous in character . . . . a disease which has a tendency to extend and grow into various parts or tissues of the body." He also said it would endanger plaintiff's life to cut into the tumor for the purpose of microscopic examination.

Defendant's doctors testified that it was impossible to tell whether the tumor was a cancerous growth or sarcoma without a microscopic examination. They agreed that whatever it was it was so located that it was inadvisable to attempt to remove it by operation because to do so would destroy too much of the sacroiliac joint. They also agreed that it created a permanent disability. They said, however, that plaintiff's injury from the fall was only a slight bruise.

While this evidence leaves some doubt in the matter of whether the bone tumor was cancerous, the evidence is even more indefinite as to whether or not the fall caused the bony tumor whatever it may be. Dr. Henry was asked the following question and made the following answer:

"Q. Doctor, assuming as a fact that a man forty-seven years of age, in good health, weighting one hundred and ninety-five pounds, was standing on this step which has been marked defendant's Exhibit 'A,' that his left foot was on the ground, that his right foot rested on the middle step, which was a distance from the ground of between

sixteen and seventeen inches, that he fell or was thrown from the step, that his back in the lumbar region struck a railroad tie which was protruding from the ground some five or six inches; *might, could or would* such a fall as that result in the condition which you found on Mr. Kimmie at the date which you examined him? A. Yes, sir.'' He testified further as to causes of sarcomas: ''I can give you the present views of the profession as to the causes of malignancy, and bones in particular. Sarcoma, which differs from carcinoma, is most commonly caused, if it is primarily sarcoma in the bone—I mean by that, developed first in the bone—is due to a bone bruise, without a fracture. It is a clinical fact where fractures exist in connection with bone bruises, sarcoma rarely develops, but sarcoma is a very—quite often happens where the bone has not been fractured. . .. . There is a well established fact that severe bruises is the most potent cause, or most frequent cause, of malignancy of sarcomatic type.'' He also said: ''There is really no pathologist yet knows really what cancer is, to tell you the cause of it; that is, we have views as to some of the exciting causes of it, but really the pathology of cancer has never been determined by any pathologist.''

Dr. Vezeau also answered affirmatively a similar question as to whether a fall *might, could or would cause* such a bone tumor.·

While the testimony of the doctors does leave, far from certain, the question of whether the tumor was a sarcoma or cancerous, yet we think it was sufficient to make that matter a question for the jury. The opinions of experts based upon examination and treatment is substantial evidence and its weight is for the jury. [O'Leary v. Scullin Steel Co., 303 Mo. 363, 260 S. W. 55; Spencer v. Q., O. & K. C. Ry. Co., 317 Mo. 492, 297 S. W. 353; Scanlon v. Kansas City, 325 Mo. 125, 28 S. W. (2d) 84; Cropper v. Titanium Pigment Co., 47 Fed. (2d) 1038, 78 A. L. R. 737, note, 78 A. L. R. 755; 22 C. J. 639, sec. 733, p. 728, sec. 823; 11 R. C. L. 574, sec. 7, p. 584, sec. 14, p. 586, sec. 16; 1 Wigmore on Evidence, 1081, sec. 673; 4 Wigmore, 115, 116, secs. 1920, 1921.] The doctors stated what opportunity for observation they had and gave the reasons for their opinions. We cannot say that the jury could not believe them. The fact that the matter could be more definitely determined by microscopic examination, and this was not made, would go only to the weight of their evidence.

However, we do not think that there was substantial evidence that the bone tumor was caused by the fall. It is true that the plaintiff said that he struck the lower part of his back and spine and indicated to the jury where he did strike, which was in the region where the tumor on the ilium developed. However, the only thing that was then found there by Dr. Vezeau, who cared for him, was a slight swelling. According to this doctor a baggy formation developed of which three and one-half months after the fall he made a laboratory

test and found was not cancerous. The X-rays taken at that time showed no bone tumor. Dr. Vezeau said this developed afterwards underneath and lateral to the baggy formation. The tumor is on the bone itself, the swelling and first formation was not in the bone. In fact, he said the tumor developed on the opposite bone (the ilium) from that (the sacrum?) over which the baggy formation appeared. No bone tumor was definitely shown by any X-ray picture until more than a year after the fall. Whether it was a few weeks or several months after January, 1930, in developing is indefinite from Dr. Vezeau's testimony. It was certainly an unusual and not an ordinary or natural result of such a fall. No layman could know or have any reasonable basis for an inference that it did result from it. ■ The opinion of the doctors that it *might, could or would* result from the fall is no more than an assurance that such a result was scientifically possible. [Edmondson v. Hotels Statler Co., 306 Mo. 216, 267 S. W. 612; Myers v. Wells (Mo.), 273 S. W. 110; Mueller v. St. Louis Pub. Service Co. (Mo. App.), 44 S. W. (2d) 875, and cases cited.] It was not substantial evidence that it did result from it and there was not here other ample evidence, tending to exclude all other causes save the fall and to prove that the fall was the cause, as in those cases. No other evidence of the doctors went further than to show possibility. They admitted that the causes of cancer are usually unknown. This evidence shows that the growth on the ilium developed a long time after the fall and is very indefinite as to how long it really was. There was no evidence as to the usual time of development of a bone cancer from known traumotic causes. Plaintiff cites many cases holding that, in different situations, there was a jury question as to whether an injury caused a cancer or other disease. In none of them was it positively shown by the plaintiff's own evidence that the cancer "was not there at all" three and one-half months after the injury. As said by this court, in commenting upon the effect of an opinion that a certain injury *"might or could"* cause a certain condition, in O'Leary v. Scullin Steel Co., 303 Mo. 363, l. c. 382, 260 S. W. 55, l. c. 61:

"The difficulty is that, after the jury has determined which expert it will believe and credits him, it comes to nothing, because what it has concluded to believe is merely that a certain thing 'might or could' produce a stated result or condition. . . . So far as the testimony goes it does not advise the jury that some other cause might not or could not have caused the result. . . . Some other cause might or could have caused it. On this record the jury might or could solve the problem solely by guessing."

Likewise, in Adelsberger v. Sheehy, 332 Mo. 954, 59 S. W. (2d) 644, l. c. 646, this court, citing the O'Leary case, said:

"The burden was on the plaintiff to show the cause. Evidence that the condition might or could have been caused by either injury or disease without any substantial showing as to which of the possible causes did produce the condition, furnishes no basis from which a jury could determine the cause."

Considered in the light most favorable to plaintiff this evidence was too insubstantial and uncertain to justify finding that the fall caused the tumor. It left the whole matter to speculation and conjecture. [See, also, Plank v. Brown Petroleum Co., 332 Mo. 1150, 61 S. W. (2d) 328; Bante v. Wells (Mo. App.), 34 S. W. (2d) 980, and cases cited.] This court has also held that "the facts on which an opinion, even of a medical expert, is based must, like the facts sufficient to support the verdict of a jury, measure up to the legal requirements." [Hall v. Mercantile Trust Co., 332 Mo. 802, 59 S. W. (2d) 664.] Even a positive opinion must have to support it, reasons and testimony which will give it sufficient probative force to be substantial evidence. It would seem that the evidence here is too indefinite and uncertain to meet the required test, but leaves it all in the realm of speculation.

We do not hold, however, as defendant contends, that it is improper to ask an expert witness if something might, could or would produce a certain result. An expert's view of possibility or probability is often helpful and proper. [22 C. J. 623, secs. 713-14; 11 R. C. L. 582, sec. 12, p. 633, sec. 52; 4 Wigmore on Evidence, 198, sec. 1976.] Where there are other facts which tend to show an accident caused a certain condition, the assurance of an expert that it is scientifically possible is of some aid to the jury in determining what are reasonable inferences to be drawn from such facts. So, also, where impossibility of a claimed result is relied upon as a defense, expert testimony to that effect is evidence for a defendant upon that issue. [Scanlon v. Kansas City, 325 Mo. 125, 28 S. W. (2d) 84.] Contrary evidence for the plaintiff, in such a case, of possibility would be proper because that matter would be a jury issue. Assurance of possibility is not of itself, however, sufficient to make a submissible case, upon the issue of cause and effect, for a plaintiff who has the burden of proof upon that issue. The trouble here is that there is no more than possibility shown by either the facts or the expert testimony.

Since the verdict in this case is too large to be justified upon any other ground except that there was a cancerous tumor caused by the fall, it cannot stand, and since the question to be determined is whether the fall did produce such result it cannot be cured by *remittitur*. Both questions can be better determined by a jury, upon another trial, which will, perhaps, have the benefit both of subsequent developments and more specific evidence.

606

The judgment is reversed and the cause remanded. *Ferguson* and *Sturgis, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE C., is adopted as the opinion of the court. All the judges concur.