[1] This is an action for damages for personal injuries. Plaintiff received a judgment for $5,000, and defendant has appealed.
[2] The defendant, a public carrier for hire, operates motorbuses over a route along McGee Street Trafficway (hereinafter called McGee), a public street in Kansas City, Missouri. On the morning of October 10, 1946, plaintiff was a passenger in one of defendant's Linwood-Benton buses as it proceeded north on McGee. This bus stopped on McGee at or near the intersection of McGee and 27th Street to discharge other passengers. It was stopped at this point when one of defendant's Armour-Paseo buses, approaching from the south on McGee, collided with the left rear and back end of the Linwood-Benton bus in *Page 398 
which plaintiff was seated, and as a result plaintiff was injured. The collision occurred at approximately 8:10 a. m.
[3] The petition alleged general negligence and the cause was submitted on the res ipsa loquitur theory by plaintiff's Instruction 1. Defendant's first contention is that the testimony of plaintiff's witnesses, on direct examination, showed the specific causes of the collision and, therefore, that it was error to permit plaintiff to submit her case on the res ipsa loquitur doctrine. A recent case on this point, which is relied upon by defendant, is Hill v. St. Louis Public Service Co., Mo.Sup. 221 S.W.2d 130, 133, where the court said: "In this connection it has been said: `A plaintiff can neither definitely state nor show that his injury was caused in a certain way and then allow the jury to speculate on whether it was caused in some other way.' Sanders v. City of Carthage, 330 Mo. 844, 51 S.W.2d 529, 531; Berry v. Kansas City Public Service Co., 343 Mo. 474,121 S.W.2d 825, 830. `When * * * the plaintiff pleads general negligence and by the pleading invokes the aid of the res ipsa loquitur doctrine, he does not lose or waive the benefit thereof, and the right to rely thereon in the submission of the case to the jury, by introducing evidence tending to show specifically the cause of the accident if by the evidence the cause is still left and remains in doubt or is not clearly shown, but where the real or precise cause is definitely shown, and is not left in doubt, "there is no occasion or room for the" presumption or inference which the res ipsa rule affords. "The plaintiff is bound by his evidence in a res ipsa case just as he would be in any ordinary negligence action and cannot in effect say to the jury, `I have shown you exactly how the accident occurred but you are, nevertheless, still at liberty to speculate and presume it may have happened some other way.'" Conduitt v. Trenton Gas 
Electric Co., 326 Mo. 133, 31 S.W.2d 21, 25, and cases there collected and cited."
[4] The defendant argues that the plaintiff "deliberately" produced witnesses, "who in response to questions put by her counsel, on direct examination, testified that the specific causes of her injuries were the high speed of the Armour-Paseo bus on a wet street and its skidding into the standing Linwood-Benton bus in which plaintiff was a passenger," and that the causes of plaintiff's injuries were not left in doubt by such testimony. Defendant bases this argument solely upon the testimony of three of plaintiff's witnesses on direct examination; namely, Mrs. Martha Manning and Ed Schuck, who were passengers on the Armour-Paseo bus, and William J. Green, a passenger on the Linwood-Benton bus. The testimony of Mrs. Manning and Mr. Schuck may be summarized as follows: On the morning in question the Armour-Paseo bus was traveling north on McGee. After the bus passed 29th Street, a passenger signaled for a stop at 27th Street and McGee. The bus was then going forty-five miles an hour and did not thereafter decrease its speed as it approached the Linwood-Benton bus standing on McGee at 27th Street. It had been raining and the pavement on McGee was wet. The front end of the Armour-Paseo bus was just about even with the rear end of the Linwood-Benton bus when the operator of the Armour-Paseo bus applied the brakes. When the brakes were applied the rear end of the bus started swinging back and forth and skidded into the Linwood-Benton bus. The bus had skidded once before, some eight blocks from 27th and McGee, on a wet street. William J. Green, the passenger who was sitting in the rear part of the Linwood-Benton bus at the time of the accident, testified that he had a clear view of the Armour-Paseo bus and that it was "coming down, it seemed, at a terrific rate of speed." He qualified this by saying that he just glanced up and saw the bus coming, and that it was a "very momentary" glance. This is all of the testimony of plaintiff's three witnesses, on direct examination, concerning the accident.
[5] Defendant refers to the skidding of the bus as one of the "causes" of the collision. Perhaps the collision would not have occurred if the bus had not skidded, but the skidding was not a cause of the collision in the legal sense. Conceding that the bus skidded, the question remains as to what caused it to skid. No doubt the *Page 399 
defendant's reference to the skidding of the bus was for the purpose of pointing out that plaintiff's evidence as to the skidding shows negligence on the part of defendant's driver when taken in connection with other evidence introduced by plaintiff. It is well settled that the mere skidding of a motor car is not of itself evidence of negligence (Story v. People's Motorbus Co., 327 Mo. 719, 725, 37 S.W.2d 898, 900, and cases cited); but skidding may be considered, along with other circumstances and conditions, in determining the question of negligent speed. Bear v. Devore, Mo.App., 176 S.W.2d 862, 864. So defendant also points to plaintiff's evidence showing that the Armour-Paseo bus was traveling forty-five miles an hour on a wet street as it proceeded north on McGee and approached the Linwood-Benton bus. Assuming that this evidence shows a specific act of negligence on the part of defendant's driver, the question presented is whether the evidence clearly shows that the speed of the bus, under the circumstances mentioned, was the precise and specific cause of the skidding and the collision.
[6] As plaintiff has pointed out, the collision could have resulted from a number of other causes, such as slick, worn out tires, a coating of mud making an unusually slick place on the street, failure to keep a lookout for vehicles parked on the street, a mechanical defect in the brakes, or an improper application of the brakes. As stated above, one of plaintiff's witnesses testified that the driver did not apply the brakes until the front end of the Armour-Paseo bus was just about even with the rear end of the standing bus, but plaintiff's evidence does not show any improper application of the brakes or that the brakes were defective. Moreover, defendant does not contend that plaintiff's evidence shows any negligence in this respect. It is to be borne in mind that even though plaintiff's evidence "tends to show" the specific cause of the accident, the benefit of the res ipsa loquitur doctrine will not be lost if by this evidence the precise cause "is still left and remains in doubt or is not clearly shown". Hill v. St. Louis Public Service Co., supra; Belding v. St. Louis Public Service Co., Mo.Sup. en Banc,215 S.W.2d 506, 510. Assuming that plaintiff's evidence tends to show the specific cause of her injury, we cannot say the precise cause of the accident was so clearly shown that it was not left in doubt. We hold, therefore, that plaintiff did not lose the benefit of the res ipsa loquitur doctrine by introducing the evidence set forth above, and that the trial court committed no error in submitting the case by plaintiff's Instruction 1.
[7] Defendant relies upon the cases of Hill v. St. Louis Public Service Co., supra; Conduitt v. Trenton Gas Electric Co., 326 Mo. 133, 31 S.W.2d 21, 25; Adams v. Le Bow, 236 Mo.App. 899,160 S.W.2d 826, 831; and Hughes v. East St. Louis City Lines, Mo.App., 149 S.W.2d 440, 441. We have carefully examined these cases and find that they are not decisive in the case under consideration.
[8] Defendant's second contention is that the trial court erred in giving plaintiff's Instruction 4 on the credibility of witnesses because it included these words: "If, upon consideration of all the evidence, you conclude that any witness has wilfully sworn falsely as to any material matter involved in the trial, you may reject or treat as untrue the whole or any part of such witness' testimony." Defendant complains that there was no occasion for giving this instruction. We are unable to agree with this view. The giving or the refusal of an instruction of this character is largely a matter in the discretion of the trial court. State v. Caviness, 326 Mo. 992, 998, 33 S.W.2d 940, 943; Farmers' State Bank v. Miller, Mo.App., 26 S.W.2d 863, 864. In this case there were serious differences in the evidence of the respective parties concerning the speed of the Armour-Paseo bus and other circumstances surrounding the collision. When the operator of the Armour-Paseo bus testified as a witness for defendant, the deposition of the operator, which contained a number of statements inconsistent with his testimony on the stand, was introduced in evidence by plaintiff for the purpose of impeachment. The medical testimony was conflicting. We hold, therefore, that the trial court did not abuse its *Page 400 
discretion by giving plaintiff's Instruction 4.
[9] Defendant also complains that plaintiff's Instruction 4 is "too broad," citing Hamre v. Conger, 357 Mo. 497, 504, 209 S.W.2d 242, 247, where the court said: "The cases of State v. Willard, 346 Mo. 773, 142 S.W.2d 1046, * * * are cited. In the Willard case the court said, 142 S.W.2d loc. cit. 1053: `We agree substantially with the annotator in 90 A.L.R.loc. cit. 81, and think a court has gone far enough when it instructs the jury that if they believe a witness has wilfully sworn falsely on a material issue, they should consider that fact in determining the credibility of the rest of his testimony.' It is also stated in the Willard case (142 S.W.2d loc. cit. 1053) that the giving of an instruction on credibility of witnesses rests largely in the sound discretion of the trial court. * * * There is nothing here to justify a ruling that the trial court abused its discretion in giving instruction No. 4. However, if there is another trial, and an instruction on credibility of witnesses is given, the courtwill observe what is said in the Willard case first above quoted." (Italics ours.) Although the word "will" appears in the last sentence of the quotation, we cannot assume that the Supreme Court intended to say that thereafter it would be reversible error to give an instruction which does not follow the exact form suggested by the annotator in 90 A.L.R.loc. cit. 81. In the instant case, plaintiff's Instruction 4 was in the "usual form." See State v. Williams, 309 Mo. 155, 186, 274 S.W. 427, 436. While it has been said that this form is not perfect, State v. Willard, 346 Mo. 773, 785, 142 S.W.2d 1046, 1053, the giving of the same, or like form of instruction, has been held not to be prejudicial error if there is some basis for it in the testimony offered in the case. Hamre v. Conger, supra; State v. Willard, supra; Bellovich v. Griese, Mo.Sup., 100 S.W.2d 261, 262; Howser v. Chicago Great Western R. Co., 319 Mo. 1015, 1027, 5 S.W.2d 59, 65; McCarthy v. Metropolitan Life Ins. Co., Mo.App., 90 S.W.2d 158, 164; Pappas Pie Baking Co. v. Stroh Bros. Delivery Co., Mo.App., 67 S.W.2d 793, 798; Alexander v. Emmke, Mo.App., 15 S.W.2d 868, 873. In the absence of a more definite pronouncement on the subject by the Supreme Court than that which appears in the quotation from the Hamre case, we hold that the trial court did not commit reversible error in giving plaintiff's Instruction 4.
[10] Defendant's third contention is that defendant's Exhibit "C" was erroneously refused admission in evidence by the trial court. Plaintiff claimed that her hearing was impaired as a result of the accident on October 10, 1946. Exhibit "C" purports to be an audiogram showing the condition of plaintiff's sense of hearing on August 15, 1940, more than six years before the accident. An audiogram is a graph showing the relation of audibility to frequency. As we understand the process, an instrument known as an audiometer is used in making such graphs. An audiometer is an instrument by which the power of hearing can be tested and measured. In an attempt to lay the foundation for the admission of Exhibit "C", defendant called as its witness Joe M. Murdock, who testified that he was president of the Audiphone Company of Kansas City, Missouri, and had been connected with the company since April, 1944; that he did not know the plaintiff in this case; that the audiogram offered in evidence came from his company's records; that it was not made by him or under his supervision; and that it was made by Frank McCurdy, a former employee of the Audiphone Company, who was last heard from about four years ago when in England in the Armed Forces. Plaintiff's counsel objected to the admission of this evidence on the following grounds: that the testimony of the witness Murdock showed that he was not present at the time the audiogram was made; that his testimony revealed that he knew nothing about the accuracy of the audiogram; and that it was strictly hearsay evidence.
[11] Defendant contends that this evidence was admissible because the man who made the audiogram was unavailable and "the exhibit and testimony concerning it was admissible under the rule that declarations made in the course of business, at or about *Page 401 
the time of the fact or facts stated occurred, by third persons who are unavailable as witnesses, are admissible."
[12] We do not agree. Our view is that the reasons forming the policy upon which the business entry exception to the hearsay rule rests are not applicable to audiograms. The fact that audiograms are made in the regular course of a business does not make them accurate; their accuracy depends upon the trustworthiness of the scientific devise used in making them and the skill of the person who operates the instrument. X-ray photographs are received in evidence because the instrument used in taking such pictures is known to be a trustworthy one. Although our research has not revealed a case where audiograms were offered in evidence, we have concluded that the basic principles and specific requirements governing the admission of X-ray photographs should govern the admission of audiograms. In order to render an X-ray picture admissible, the proponent must first establish the accuracy of the photograph by showing, among other things, that such picture was made by a trustworthy instrument and was properly taken by a person qualified for that work; and he must verify the identify of the person or object photographed with the person or object whose condition is in issue in the case. Clark v. Reising, 341 Mo. 282, 287, 107 S.W.2d 33, 35; Hodges v. Chevrolet Motor Co., Mo.App., 116 S.W.2d 170, 172; III Wigmore, Evidence, sec. 795; 32 C.J.S., Evidence, p. 616, § 712; 20 Am.Jur. p. 615, sec. 737. The sufficiency of the verification of an X-ray picture is within the discretion of the trial judge. Clark v. Reising, supra. Applying these requirements to the audiograms in question, it is obvious that the trial court did not err in excluding defendant's Exhibit "C". Defendant's witness Murdock testified that he was not present when the audiogram was made and did not know the plaintiff herein, so that he could not properly identify the audiogram. This point is ruled against defendant. We express no opinion as to whether audiograms should be admitted in evidence when properly identified.
[13] Defendant's fourth contention is as follows: "There is no medical testimony in the record on which to base a finding that plaintiff's hearing was impaired as a result of any trauma, and the trial court erred in refusing defendant's Instruction F, withdrawing the alleged impairment of plaintiff's hearing as an element of recovery." Plaintiff claimed that the hearing in her right ear was impaired as a result of the collision. She offered the following evidence to prove the alleged causal connection. Plaintiff testified that the hearing in her left ear had been deficient since childhood, but that prior to the accident the hearing in her right ear was normal; that she had no trouble hearing in her previous work as secretary and stenographer, beauty shop operator, state beauty shop inspector, or in her position with the Federal Housing Administration prior to the accident on October 10, 1946; that before the accident she could take dictation but always sat on the side where it would "hit" her right ear; that when the accident occurred the earring she was wearing was ground into her right ear; that after the accident there was a swollen place behind her right ear; that she first noticed the impairment of the hearing in her right ear the day after the accident; that since the accident she had not taken dictation; that at times she could not hear a telephone ring; that six weeks after the accident she purchased a hearing aid; and that no member of her family ever had any deafness except that when her mother reached the age of seventy-seven she was rather hard of hearing.
[14] One of plaintiff's witnesses was a woman who had known plaintiff for several years and who worked in the same office with her and saw her almost every day; one was a woman who lived across the hall in the apartment house where plaintiff resided; and another was a woman who lived in the same apartment with plaintiff. The testimony of these witnesses was to the effect that before the accident plaintiff's hearing seemed to be normal, but that after the accident she was hard of hearing. A witness, who before and after the accident was local manager of the Federal Housing Administration, and who hired plaintiff as a stenographer, testified that prior to the accident plaintiff had a slight deficiency in her hearing, *Page 402 
but that "she was much harder of hearing after the accident."
[15] Dr. C. R. McCubbin testified that he saw the plaintiff at the hospital the day after the accident; that she was suffering severe pain, especially around her head and neck; that there was a swelling on the right side of her head; that while plaintiff was in the hospital, she said there seemed to be a heavy weight on the right side of her head and that she couldn't hear from that side as well as she did before the accident; that although he had known plaintiff for about thirty-five years and had been her physician during part of that period, he had not noticed any impairment of her hearing prior to October 10, 1946. He had never examined plaintiff's ears for any purpose.
[16] Dr. W. E. Keith, an eye, ear, nose, and throat specialist, testified that when plaintiff came to him in November, 1946, for professional advice, he sent her to the Maico Company for audiograms and as a result of the tests he prescribed a hearing aid; that he had never examined plaintiff's sense of hearing, but had examined her eyes in 1922 and 1940, and had known her for many years; and that he had never noticed any impairment of her hearing prior to November, 1946. On cross-examination, he was asked whether deafness is hereditary and he answered: "Deafness can be hereditary, or it can be traumatic, or it can be catarrhal." The audiograms were excluded when offered in evidence by plaintiff, but the person who made them was allowed to use them to refresh his memory. He testified that the audiograms made November 6, 1946, showed a hearing deficit in plaintiff's left ear of 46.1%, and in the right ear of 31.5%. An audiogram made eight days later showed a very slight improvement in both ears.
[17] Defendant's witness, Dr. Robert E. Moore, examined plaintiff and tested her hearing on March 15, 1947, three months before the trial. He said: "Q. Did that (the test) leave any doubt in your mind that there was an actual impairment of her hearing? A. I felt that she had an actual impairment."
[18] Defendant cites several cases as authority for the proposition that the opinion of Dr. Keith that "Deafness can be hereditary, or it can be traumatic, or it can be catarrhal" is not of itself sufficient evidence from which a jury can find that the alleged impairment of plaintiff's hearing was caused by the accident. Hunt v. Armour Co., 345 Mo. 677, 136 S.W.2d 312, 318; Kimmie v. Terminal Railroad Ass'n of St. Louis, 334 Mo. 596,66 S.W.2d 561, 564; Waterous v. Columbian National Life Ins. Co., 353 Mo. 1093, 186 S.W.2d 456, 459; Adelsberger v. Sheehy, 332 Mo. 954, 59 S.W.2d 644, 646. These cases do announce that doctrine and that is the rule in Missouri. As stated in the Adelsberger case, 332 Mo. loc. cit. 959, 59 S.W.2d loc. cit. 646: "Evidence that the condition might or could have been caused by either injury or disease without any substantial showing as to which of the possible causes did produce the condition, furnishes no basis from which a jury could determine the cause." (Italics ours.) In the Hunt and Kimmie cases, supra, where the only evidence on the issue of causation was the opinion of medical experts who testified that a certain occurrence or condition might, could or would produce a certain result, it was held, in accordance with the rule stated above, that the plaintiff failed to make a submissible case on the issue of causation. In the Waterous case, the plaintiff's expert witness did testify that in his opinion plaintiff's paralysis was caused by a blow on the head, but the case does not hold that a plaintiff in an action for personal injuries cannot make out a submissible case on the issue of cause and effect unless he introduces the positive opinion of an expert witness that his injury was caused by the accident. In the Adelsberger case, supra, the only question before the court was whether the trial court erred in submitting the issue of permanent injuries to the jury. Since there was no evidence in the record tending to show that plaintiff's injuries permanently aggravated a progressive and incurable heart disease which he had prior to the accident, except the testimony of a physician who said that a certain heart condition could be caused by physical shock, it was *Page 403 
held, and correctly so, that the trial court erred in submitting the question of permanent injuries to the jury. However, these cases do not hold that such opinion evidence has no evidential value. In the Kimmie case, the court said: 334 Mo. 596, 605, 66 S.W.2d 561, 565 "We do not hold, however, as defendant contends, that it is improper to ask an expert witness if something might, could, or would produce a certain result. An expert's view of possibility or probability is often helpful and proper. 22 C.J. 623, §§ 713, 714; 11 R.C.L. 582, § 12, p. 633, § 52; 4 Wigmore on Evidence, 198, § 1976. Where there are other facts which tend to show an accident caused a certain condition, the assurance of an expert that it is scientifically possible is of some aid to the jury in determining what are reasonable inferences to be drawn from such facts." (Italics ours.) See also Feltz v. Terminal Railroad Ass'n, 336 Mo. 790, 798, 81 S.W.2d 616. It is conceded in all of the cases cited by defendant that where the plaintiff not only introduces in evidence the opinion of an expert witness that a certain accident "might or could" cause a certain condition or that the condition might or could have been caused by either injury or disease, but also produces other evidence tending to show with reasonable certainty that the accident caused the condition, the plaintiff has made a submissible case on the issue of cause and effect.
[19] In the instant case, the opinion of Dr. Keith was not the only evidence on the issue of cause and effect. In addition, there was abundant evidence from which the jury could have found that the hearing in plaintiff's right ear was normal prior to the accident and that immediately thereafter the hearing in that ear was impaired. The testimony concerning plaintiff's sense of hearing before and immediately after the accident is evidence that the impairment of the hearing in her right ear was caused by the accident. See Pettyjohn v. Interstate Heating Plumbing Co., Mo.Sup., 161 S.W.2d 248; Perringer v. Lynn Food Co., Mo.App., 148 S.W.2d 601, 611; Hamlin v. N. H. Bragg Sons, 129 Me. 165, 151 A. 197. True, most of the testimony as to plaintiff's condition before and after the accident came from laymen and physicians who had not examined plaintiff's ear, but opinions based on observations may be given by non-expert witnesses as to another's state of health, hearing or sight, or the like, and are denominated statements of fact having evidential value. Partello v. Mo. Pac. R. Co., 217 Mo. 645, 655, 117 S.W. 1138, 1140; Fulton v. Met. Street R. Co., 125 Mo.App. 239, 247, 102 S.W. 47. Plaintiff's evidence that she suffered injuries to her neck at the time of the collision, and that immediately thereafter there was a swelling back of her ear, was not contradicted. As stated above, Dr. Keith testified that it was scientifically possible for deafness to be caused by trauma as well as by heredity or disease. Plaintiff testified that there had never been any deafness in her family except in the case of her aged mother. One of defendant's expert witnesses testified that plaintiff's partial deafness was due to disease and not to trauma, but the question was resolved by the jury in favor of plaintiff, and we must consider the facts most favorable to plaintiff. Plaintiff's evidence, as a whole, tended to exclude other causes. It seems clear that this case is distinguishable from those cited by defendant where there was no substantial showing as to which of the possible causes did produce the condition. We hold, therefore, that there was sufficient evidence from which the jury, aided by the opinion of Dr. Keith, could have drawn the inference with reasonable certainty that the collision was the cause of plaintiff's impaired hearing, and that the trial court did not err in refusing to give defendant's Instruction "F".
[20] Defendant's last point is that the verdict of $5,000 is excessive. The evidence is conflicting as to the character and extent of plaintiff's injuries, but in determining whether or not the verdict is excessive we must consider the evidence and inferences favorable to plaintiff and disregard conflicting testimony. Rinderknecht v. Thompson, Mo.Sup., 220 S.W.2d 69, 75; Henderson v. Dolas, Mo.Sup., 217 S.W.2d 554, 557. The evidence concerning plaintiff's impaired hearing is set forth above. Plaintiff also introduced evidence tending to show that she suffered other injuries as a result *Page 404 
of the accident. Plaintiff testified that when the collision occurred, she was rendered unconscious for a few minutes. Her right arm was bruised from the shoulder to the wrist and there was a cut above the right elbow; her neck "hurt terrific," and the next day after the accident she was taken to Research Hospital by her physician, Dr. C. R. McCubbin. Dr. Ralph Mueller, an orthopedic surgeon, was called in and after X-ray pictures were taken a traction splint was applied; she was in traction ten days and nights during which time she was given sleeping tablets and some "hypos." After her return home she went three times a week during November and December to the office of Dr. Mueller for diathermy treatments and massage.
[21] In addition to the impairment of the hearing in her right ear, plaintiff's complaints at the time of the trial were that her "right arm has a numbness from the elbow down to the fingers" when she first awakens, and after she is up awhile her arm is in "fair shape," but by 2 o'clock in the afternoon her arm and the back of her neck ache, and she feels like something is pulling her down. There is a spot back of her ear that pains "clear through to the eye" like a "small toothache." She says that she is more nervous than she was before the accident; that she has restless nights and that she does not grip as well with her right hand as with the left. Plaintiff produced several lay witnesses who said that after the accident plaintiff was nervous, and at times seemed to be in pain.
[22] As stated before, Dr. McCubbin testified that when he first saw plaintiff at the hospital she was suffering severe pain, especially around her neck and head, and that there was a swollen place back of her right ear. Dr. Mueller testified that when he saw plaintiff at Research Hospital she had some bruises on her right arm and was suffering severe pain in her neck and the back of her head; that his diagnosis was that she had a subluxation or partial dislocation of the small vertebrae of the neck; that he placed her head in traction and after seven or eight days her neck was pulled back into normal position; that the cartilage between the vertebrae of plaintiff's neck was damaged, and that the pain, numbness and loss of grip of which plaintiff complains come from the injury to her neck; that there will be a "certain degree of permanent disability resulting from this injury"; that a spur formation shown on the bottom of the fourth cervical vertebra in an X-ray picture made November 2, 1946, could have been produced by trauma; that the spur formation may become painful and can limit motion in the course of time and affect rest and sleep; that there is no treatment known to medical science that would permanently relieve the pains of which plaintiff complains. The X-ray pictures did not reveal a concussion or any fractured bones.
[23] Plaintiff also testified that she was fifty-eight years old at the time of the trial; that she had been employed by the Federal Housing Administration since May, 1941; that in her work she audits mortgage loans, handles telephone calls by using a hearing aid, and does typing. She takes no dictation. After the accident plaintiff did not work for forty-seven consecutive days. After that period she tried to work again, but was compelled to go home for a few days and began working regularly on January 1, 1947. The time she was not working was deducted from her accumulated twenty-six days "sick leave" and when that was exhausted the balance of the time off was subtracted from her "annual leave."
[24] Plaintiff's employer and an office associate both testified that plaintiff was not as efficient after the accident as she was before. According to plaintiff's testimony, she was earning $3,200 a year at the time of the accident and at the time of the trial. Her medical expenses and the cost of her hearing aid amounted to approximately $365, and the upkeep on the hearing aid has cost her from $5 to $6 a month. "There is no definite rule by which the amount which should be permitted to stand can be determined. Each case must be considered upon its own peculiar facts and some consideration must be given the decrease in the purchasing power of money and to the matter of maintaining some reasonable uniformity in the matter of verdicts for similar injuries." Hill v. St. Louis Public Service Co., Mo.Sup.,221 S.W.2d 130, 136. Considering *Page 405 
the evidence of plaintiff's injuries in the light most favorable to plaintiff, including the evidence of plaintiff's loss of hearing, we conclude that there was substantial evidence to support the verdict of the jury. The jury assessed the damages, and the trial judge who saw the witnesses and heard the testimony permitted the verdict to stand. We have examined the cases cited by defendant and find that the injuries in those cases are not comparable to the injuries in this case. Moreover, they were all decided before the present economic changes and, therefore, are not decisive in this case. All things considered, we cannot say that this verdict calls for appellate interference.
[25] Finding no reversible error, the judgment should be affirmed.
[26] SPERRY, C., concurs.