Linda IMMEKUS, a minor, by her next
friend, Laura F. Immekus, Plain-
tiff-Respondent,

v.

Betty QUIGG, Defendant-Appellant.

No. 8508.

Springfield Court of Appeals.

Missouri.

Aug. 16, 1966.

Motion for Rehearing or for Transfer to
Supreme Court Denied Sept. 6, 1966.

A. L. Shortridge, Joplin, for defendant-appellant.

John Rahoy, Edward V. Sweeney, Monett, for plaintiff-respondent.

HOGAN, Judge.

This is an action for personal injuries sustained, according to the plaintiff, when she was struck by the defendant's automobile while crossing the street on foot. Plaintiff has had judgment on a jury verdict for $5,000.00, and the defendant has appealed. Several points have been briefed and argued in this court, but we find it necessary to consider only two of them. One of the defendant's contentions is that there is no evidentiary basis for either of the two hypotheses of negligence submitted, and we therefore briefly review the evidence. It may be noted that the cause went to the jury on the defendant's failure to keep a careful lookout and her failure to stop after danger of striking the plaintiff became apparent. The defendant neither pleaded nor attempted to submit the plaintiff's contributory negligence.

On November 16, 1962, Linda Immekus, then seven years old, was taken home from school by a Mrs. Doris Beckham. The Immekus residence was on the east side of Monroe Street in Joplin, Missouri. Monroe is described as a blacktop street, "a little bit over twenty-six feet" wide, without curbs. Mrs. Beckham stopped "across the street" from the Immekus residence on the west side of Monroe, with all four wheels on the pavement. Linda was in the back seat.

At the same time, the defendant, also taking children home from school, was driving north on Monroe. It was between 3:00 and 4:00 P.M. when this accident occurred, and there was no oncoming traffic for the defendant except the Beckham car. No automobiles were parked on either side of the street. As Mrs. Quigg approached the Beckham car, going north on the east side of the street, she saw Mrs. Beckham

and saw that there were children in the car with her. Defendant estimated that her speed was ten to fifteen miles per hour. When defendant was in the "middle of the block," "several car lengths" from the Beckham vehicle, she noticed the door on the right side of Mrs. Beckham's car opening, and reduced her speed slightly. She then saw Linda at the back of the other car.

Plaintiff's evidence was that Linda walked around the rear of Mrs. Beckham's car, looked both ways, and started walking across the street. Both Mrs. Beckham and her son, Mike, age ten, were positive in their assertion that Linda did not run, but that she walked. The plaintiff's own testimony is somewhat indefinite as to her exact position in the street when she was struck, but from Mrs. Immekus' testimony that Linda was lying about five feet from the east edge of the pavement after the accident and before she moved, and from Mike Beckham's testimony that she was thrown forward when she was hit, it may be inferred that Linda was struck about five feet from the east edge of the pavement. Mike Beckham, who was plaintiff's only independent eyewitness to the accident, testified that the defendant's vehicle struck the plaintiff but did not run over her. Plaintiff had other evidence indicating that, at the time of the accident and again a day or two afterward, the defendant had said she hit the plaintiff, and Mrs. Beckham stated that the defendant had said, immediately following the accident, that she did not see the plaintiff. It is conceded that the only visible marks of plaintiff's injury were a skinned hand and a bruise, "about three inches across," on her right hip.

Defendant, on the other hand, denied that her vehicle ever came in contact with the plaintiff. Rather, Mrs. Quigg testified, Linda "looked right at me," then "darted right out in front of me." As the plaintiff came to a point two or three feet ahead of the Quigg vehicle, and "a foot to the [west] side," defendant testified, plaintiff "was standing there holding a book and she looked at me and she had her mouth open and she

she was standing on one foot and she had lost her shoe and she was turned and she was off balance and she fell." Defendant's testimony was that she was "afraid the child might be hurt"; consequently, she "got out to see what had happened," but actually had stopped her vehicle and was outside in the street when plaintiff fell.

■ The defendant's argument that the plaintiff's instructions are not supported by the evidence is lengthy and diffuse, and we need not consider all its aspects in detail. It has several weaknesses, principally that it assumes inferences less favorable than those which the evidence in fact supports. The plaintiff is entitled to a consideration of the evidence and the reasonable inferences therefrom in a light most favorable to her submitted theory of the action, Rudin v. Moss, Mo., 349 S.W.2d 893, 894 [1], and since the plaintiff's case was based in considerable part upon varying estimates of speed and distance, she is entitled to have the sufficiency of her case judged according to the "happiest (from his standpoint) and most favorable combination of facts which can be picked or inferred from the whole evidence * * *." Montgomery v. Petrus, Mo.App., 307 S.W.2d 24, 27 [4].

■ To determine the inferences permissible from a given set of facts, we may, within limits, take judicial notice of reaction time, braking and stopping distances, and the average walking speed of pedestrians. Losh v. Benton, Mo., 382 S.W.2d 617, 619 [1–3]; DeLay v. Ward, 364 Mo. 431, 442–443, 262 S.W.2d 628, 635–636 [9] [10] [11]; Anno., 84 A.L.R.2d 979, 980–981, Section 2 (1962). We need not collect all the speeds and distances to demonstrate exactly all the possibilities. It is sufficient to apply our computations to the period after Linda started across the street to show that she made a case upon her submitted theory. Bearing in mind that the Beckham vehicle and the defendant's car were the only two on the street, and that the defendant's view ahead was unobstructed, we take note that Monroe is, by the record, "a little bit over

twenty-six feet" wide. There was evidence that Linda did not run, but walked, from a point behind the Beckham vehicle to the place where she was struck, and there was evidence that she "went straight across the street." The Beckham car was parked on the west side of the street, and we may assume, as defendant assumes, that it occupied the west six feet of the pavement. One witness testified that the impact "knocked [plaintiff] the opposite way of the car," and there was evidence tending to prove that after Linda was hit, and before she rose, she was lying five feet from the east edge of the pavement. It may be inferred, then, that Linda was in view during the time she walked fifteen feet. We may notice judicially that she would walk at a speed between 2.9 feet and 4.4 feet per second. DeLay v. Ward, supra, 364 Mo. at 442, 262 S.W.2d at 635 [9]. Linda would then have been in view between 3.4 and 5 seconds, and in that time the defendant, going ten miles per hour, or approximately 14.6 feet per second, would have gone between 50 and 73 feet. Allowing the defendant a reaction time of three-quarters of a second, she would have had between 39 and 62 feet in which to take effective action. If we do not know judicially the precise distance in which an automobile traveling at ten miles per hour can be stopped, we do take judicial notice that it can be stopped in less than 39 feet. DeLay v. Ward, supra, 364 Mo. at 442–443, 262 S.W. 2d at 635–636 [10]; Edwards v. Dixon, Mo. App., 298 S.W.2d 466, 469 [1–4]. A jury could reasonably infer, then, that the defendant had time to stop.

 Turning to the plaintiff's lookout submission, we think the defendant understates her duty to the plaintiff, in the circumstances of this case. Largely on the basis of her own testimony, or rather her negative answer to counsel's question whether she ever diverted her gaze away "from right straight ahead of you up to the time you stopped your car," the defendant maintains that by looking continuously at the Beckham car she discharged her duty to keep a lookout, and therefore there is no basis for the plaintiff's hypothesis that she failed to do so. The duty to maintain a vigilant lookout involves not only the duty to look, but the duty to see and take cognizance of that which a very careful and prudent person would see in similar circumstances, Hildreth v. Key, Mo.App., 341 S. W.2d 601, 606 [3], and the record facts do not bear out the defendant's contention that her view was obstructed, as was the case of O'Neill v. Claypool, Mo., 341 S.W.2d 129. Mrs. Quigg stated that as she drove north on Monroe she saw Linda "at the back of the Beckham car"; that she had then slowed down and was going not more than ten miles per hour, and that Linda was two or three feet behind the Beckham car. Of course, in connection with this evidence, defendant fixed the distance between her and plaintiff as being very short, but a jury was at liberty to accept her statement that she saw plaintiff and at the same time reject her estimate of the distance which separated them, for it was free to accept her testimony in part and reject it in part, when considered in relation to the other testimony and the other facts and circumstances of the case. Huffman v. Mercer, Mo., 295 S.W.2d 27, 32 [3]; Birmingham v. Kansas City Pub. Serv. Co., 361 Mo. 458, 466, 235 S.W.2d 322, 327–328 [7]; Hutchison v. Thompson, Mo., 175 S.W.2d 903, 911 [10]. In this instance, a jury might reasonably have concluded that Linda came in view while the defendant was more than 73 feet away. Contrary to the defendant's position, her duty to act was not deferred until the danger of collision became apparent; rather, she was required to anticipate that Linda might imprudently cross the street even though she was approaching, Hildreth v. Key, supra, 341 S.W.2d at 607; and while the lookout submission presupposes time and distance sufficient to avoid the casualty, Zalle v. Underwood, Mo., 372 S.W.2d 98, 102 [2], it seems to us that since the defendant at least inferably had the ability to stop, she also had the ability to slacken her speed sufficiently to allow Linda

to escape, or to sound a warning of her approach. We must hold that the plaintiff's instructions were supported by the evidence.

■ The other point for consideration, which we think is dispositive of the appeal, is whether defendant's Instruction 11 should have been given. After the accident, the plaintiff admittedly developed rheumatic fever, and she asserted and sought to prove that the blow she received in the accident either caused her to develop that illness or activated a previously dormant condition. The defendant maintained that there was no causal connection between the accident and plaintiff's rheumatic fever, and offered Instruction 11, which in effect withdrew the plaintiff's subsequent illness from the jury's consideration as an element of damages. The parties do not discuss or question the basic legal principles involved, and we need not restate them at length. A plaintiff may recover for the aggravation of an existing disease, if the aggravation is caused by the negligence of a defendant, and he may recover such damages as proximately result from the activation of a dormant or latent disease, Widener v. St. Louis Pub. Serv. Co., 360 Mo. 761, 768, 230 S.W.2d 698, 701 [4, 5]; Neff v. City of Cameron, 213 Mo. 350, 365, 111 S.W. 1139, 1143, 18 L.R.A.,N.S., 320; Herndon v. City of Springfield, 137 Mo.App. 513, 520, 119 S.W. 467, 469 [2], but, in any case, the plaintiff has the burden of showing by substantial evidence that there is a causal connection between the defendant's negligence and the injuries for which recovery is sought. Berry v. Kansas City Pub. Serv. Co., 341 Mo. 658, 676–677, 108 S.W.2d 98, 107; Moore v. Glasgow, Mo. App., 366 S.W.2d 475, 483 [9]; Gulley v. Spinnichia, Mo.App., 341 S.W.2d 301, 304 [1]. The question presented is whether the plaintiff's evidence establishes that causal connection.

As indicated, this casualty occurred on November 16, 1962, during the afternoon. Plaintiff's only visible external marks of injury were a bruise "about the size of a teacup" on her right hip, and a "scraped" hand. Very shortly after the accident, Linda was examined by a Dr. Edward Martin, a physician who ordinarily looked after the Immekus family, and she was hospitalized for five days in light (five-pound) traction. X-rays taken on November 21, 1962, by a Dr. R. A. Payne were negative for bone injury. On that day, Linda was discharged from the hospital, and by December 11 Dr. Martin considered that she had made a "complete recovery from [the] accident with no residual evidence of disease or injury."

A short time after the accident, Linda developed new symptoms. The record does not date the onset of Linda's subsequent illness exactly, but approximately one month following the accident her feet and legs began to hurt. Linda described her pains as "just pain that will go through them [her legs] and stay for a while and then * * * leave." The record also indicates that on December 17, 1962, Mrs. Immekus called Dr. Martin about Linda's joint pains and that he prescribed cortisone, aspirin and demarol, and advised bed rest. However, Mrs. Immekus was dissatisfied with Linda's progress, and plaintiff was taken to see Dr. W. W. Hurst, a Joplin orthopedist. On December 27, 1962, after making a thorough clinical and X-ray examination, Dr. Hurst "felt that [plaintiff's] acute rheumatoid arthritis or rheumatic fever must be considered as aggravated by trauma * * *" and referred Linda to a Dr. Donald R. Patterson, who specializes in obstetrics and pediatrics. On January 15, 1963, Dr. Patterson examined Linda and promptly diagnosed her illness as rheumatic fever. Dr. Patterson prescribed penicillin, a steroid, and "probably" aspirin. Linda improved, and by June 10, 1963, Dr. Patterson believed that the acute phase of her rheumatic fever had passed but that it would be necessary for her to "stay on" antibiotics for an extended period in the future, and then "watch herself all of her life." Dr. Hurst believed that Linda's ail-

ment "* * * will probably become a chronic, mild disabling thing."

Upon the trial of this case, Dr. Hurst was the plaintiff's sole medical witness. Of the physicians who examined and treated the plaintiff, he alone was of the opinion that there was a causal link between the accident and plaintiff's subsequent illness. The appellant has dwelt at length upon the sufficiency of the plaintiff's medical testimony, and we are invited to rule, in substance, that Dr. Hurst's testimony is so inconsistent and self-conflicting that no reasonable conclusion can be drawn from it. We think we cannot quite so rule, but we do agree that the doctor's testimony demonstrably lacks the assurance necessary to constitute substantial evidence of causation. A few examples will illustrate the basis for this conclusion. As indicated, the doctor first examined the plaintiff in December 1962, and he then referred her to a pediatrician. On June 3, 1963, in counsel's words, he did a "re-evaluation" of the plaintiff. He was asked:

"Q. And what conclusion or opinion did you form based on your second examination, Doctor?

A. Well, I *felt* that this child *apparently* had a beginning rheumatic fever which was aggravated by the stress of the trauma sustained as a result of the accident in question under the stress theory. That she had adequate and competent care, but I *felt* she needed to be on further treatment for a prolonged period of time and that the costs of continued medication would mount up so that allowance should be made in her settlement to care for this—her care and medication and I felt that she had improved since her last examination." (Our emphasis.)

Again, being asked if in his opinion there was a causal relationship between the injury and the rheumatic fever which plaintiff contracted, the doctor gave this answer:

"A. Well, I feel that there was a certain degree, *I mean it certainly didn't cause it,* *because we don't know the cause of rheumatic fever.* [Our emphasis.] We know it's a collagenous disease, but we must accept the fact that it is a depletion of the cortico-steroid hormone that sets up a depletion of that gland and causes the rheumatoid arthritis because we know that rheumatoid arthritis and psoriatic arthritis and the so-called rheumatic fever are all kissing cousins; they are one and the same group of diseases."

Counsel pressed the matter, and Dr. Hurst stated that his positive conclusion, upon a third examination in May 1965, was that plaintiff then had no acute rheumatoid or rheumatic fever, but that he found "suggestive Patrick's signs on the right side and a positive Ober's sign." This meant that there was probably some bursitis over the trochanter of the hip on the right side. The doctor was then asked if this condition was directly caused and brought about by the accident, and he answered:

"A. Well, I feel that it was and then, of course, she has been off of these medications. Now, she is taking nothing but aspirin and, of course, when I saw her the second time, she was on penicillin salicylates at that time."

 Of course, we realize that the sufficiency of medical evidence does not turn solely upon the physician's choice of appropriate words indicating a substantial probability of causation; even though medical testimony indicates nothing more than that a certain result is scientifically possible, it is admissible to aid the jury in determining the reasonable inferences to be drawn from the facts, Kimmie v. Terminal R. R. Ass'n of St. Louis, 334 Mo. 596, 605, 66 S.W.2d 561, 565 [9]; Bertram v. Wunning, Mo.App., 385 S.W.2d 803, 805–806 [1], and though the medical testimony may indicate only the possibility or chance of the causal relation in question, if the plaintiff also produces other evidence tending to show with reasonable certainty that the accident proximately caused the claimed in-

jury or disease, then he has made a submissible case on the issue of cause and effect. Ficken v. Hopkins, Mo., 389 S.W.2d 193, 202 [16]; Quadlander v. Kansas City Pub. Serv. Co., 240 Mo.App. 1134, 1144, 224 S.W.2d 396, 403; Anno., 135 A.L.R. 516, 532–539, Section IV (1941). This does not help the plaintiff in this case, because the origin of her disease was the very point in controversy, and the medical testimony was that the etiology or cause of rheumatic fever is obscure. In addition to the statements quoted, Dr. Hurst said, at one point, that "we [physicians] don't know the cause or what brings it on." At another point, discussing the cause and nature of the disease, he stated, "* * * there are several opinions—Selye's theory. No, what you are thinking of is that the streptococcus is an organism which incites rheumatic fever as a result of sore throat and tonsillitis. That theory—there is a theory of Comeral which states body inadequacies—if you want to go into theories of rheumatic fever we could stay here all afternoon. Everybody's got a pet idea." Dr. Patterson, the pediatrician to whom Dr. Hurst had referred Linda, testified that "[r]heumatic fever is a group of complaints that apparently stem from an allergic reaction to a strep[tococcus] * * *. [Y]ou get one Strep infection and you become sensitive to it and then at a later date if you develop another strep infection then your body reacts in this multifacet way of aches and the pains and the fever and someone years ago, smarter than I, called it rheumatic fever." Dr. Patterson was of the opinion that the accident had nothing to do with the rheumatic fever. Dr. E. H. Hamilton, an internist called by the defendant, stated that in his opinion trauma was not a source of rheumatic fever, but that "there is a difference of opinion."

What this comes down to is that while the jury could doubtless infer that Linda sustained *some* injury as a result of the accident, Neal v. Kansas City Pub. Serv. Co., 353 Mo. 779, 788, 184 S.W.2d 441, 445–446 [6], it was left without an evidentiary basis from which to infer that the accident was a legal cause of her rheumatic fever. The causal relationship, if any, between the accident and the development of plaintiff's illness was a matter of scientific cognizance, Restatement (Second) Torts, Section 458, Comment b, p. 499 (1965), and Dr. Hurst's testimony, in a most sanguine view, amounts only to an assurance of scientific possibility. Inasmuch as the experts themselves could not say with reasonable certainty that the accident caused the disease, a jury composed of laymen would have no way of knowing or inferring that Linda's rheumatic fever resulted from the accident; it could resolve the problem only by guesswork or speculation. Derschow v. St. Louis Pub. Serv. Co., 339 Mo. 63 at 68, 95 S.W.2d 1173 at 1175–1176 [5–7]; Bertram v. Wunning, supra, 385 S.W.2d at 807 [4]; Moore v. Glasgow, supra, 366 S.W.2d at 483 [9, 10]. We must assume that the jury considered the evidence regarding the rheumatic fever in assessing damages, and that such evidence augmented the damages substantially. Since the jury could properly have found that some injury was sustained, it would have been improper to direct a verdict, Neal v. Kansas City Pub. Serv. Co., supra, 353 Mo. at 788, 184 S.W.2d at 445–446 [6], but defendant's withdrawal instruction should have been given. Berry v. Kansas City Pub. Serv. Co., supra, 341 Mo. at 676–677, 108 S.W.2d at 107 [12, 13]; Bertram v. Wunning, supra, 385 S.W.2d at 807; Franklin v. Kansas City Pub. Serv. Co., 239 Mo.App. 151, 156–157, 186 S.W.2d 546, 549 [6]. For the reasons indicated, the judgment is reversed, and the cause remanded.

STONE, P. J., concurs.

TITUS, J., not participating, because not a member of the court when this cause was submitted.