WESTINGHOUSE MACH. CO. et al. v. C. & G. COOPER CO.

(Circuit Court of Appeals, Sixth Circuit. August 4, 1917.)

No. 2916.

1. PATENTS &wkey;328—VALIDITY AND INFRINGEMENT—VALVE MOTION FOR GAS MOTORS.

The Mees patent, No. 921,864, for a valve motion for gas motors, claim 5, is void for lack of invention in view of the prior art. Claims 6, 7, and 8 *held* not anticipated, valid, and infringed.

2. PATENTS &wkey;176—WORDS AND PHRASES—"SIMULTANEOUS."

The word "simultaneous," as used in a patent claim, does not imply absolute synchronism from beginning to end, but has some elasticity. Events may be substantially or relatively simultaneous, although not absolutely so.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Simultaneous.]

3. PATENTS &wkey;174—CLAIMS—CONSTRUCTION.

Though it be conceded to be a close question whether invention was involved in adding another element to an existing combination, yet, if invention is found, this concession does not lead to any particularly narrow construction.

Appeal from the District Court of the United States for the Eastern Division of the Southern District of Ohio; John E. Sater, Judge.

Suit in equity by the Westinghouse Machine Company and others against the C. & G. Cooper Company. Decree for defendant, and complainants appeal. Reversed and remanded.

This is a suit for infringement of patent No. 921,864, for a valve motion for gas motors, issued May 18, 1909, to Gustave Mees, and assigned to appellants (hereafter called plaintiffs). The court below held that the structure made by the appellee (hereafter called defendant) did not infringe, and dismissed the bill.

Engines of the type here involved are operated by successive explosions of a mixture which is a combination of air and a gas of sufficiently constant quality. Increased power from the explosion may be had by changing the proportions of gas and air, so as to give a more highly explosive mixture, or by increasing the quantity of the mixture for one explosion. The former method may be designated as quality control; the latter, quantity control. By the use of either, the speed of the engine revolutions may be varied; but for some purposes—and, typically, for driving a dynamo—it is important that

the speed be constant, and since the load varies from time to time, and the increased load tends to decrease the speed, it is essential in such engines that there should be some automatic control through the aid of a governor which will increase the power to meet an increased load, and vice versa, so that the speed may be constant.

Generally speaking, this result had been fairly accomplished in various ways, before Mees' invention. It had been most common to mix the air and gas in a mixing chamber at some distance from the inlet valve in the engine cylinder, and to allow the governor to operate a throttle in a passageway from the mixing chamber to the inlet valve. This was quantity control. Devices had also been applied in which the governor regulated the size of the gas ports opening into the mixing chamber, thus effecting quality control of the mixture therein. From these more common plans, Mees departed considerably. Instead of having merely a pipe leading from the mixing chamber to the inlet valve, he constructed a cylindrical chamber mounted on the (vertical) cylinder, and in which chamber the vertical operating rod or stem of the inlet valve was axially located. In the wall of this chamber, he provided, toward the upper part, one or more ports for admitting air, and in the lower part one or more entrance ports for gas. He then mounted upon this valve stem, so as to reciprocate therewith, an open-ended, hollow piston sliding in this cylindrical chamber and having ports registering with those in the chamber wall, whereby the longitudinal reciprocation of the valve rod as the valve opened and shut, would open and shut the air and gas ports, and the piston became properly called a piston valve. As the inlet valve was opened inwardly into the cylinder by the suction stroke of a four cycle engine, the piston valve would be drawn downwardly and the air and gas ports opened to an extent determined by the prearranged adjustment of the parts, and the air and gas, in the predetermined proportions, would pass together through the inlet valve into the engine cylinder. As the inlet valve was released by its cam and seated by its spring in the usual way, the piston would rise and the gas or air ports both would be shut off.

As so far described, the element of automatic control is not involved, there being merely a permanent or semi-permanent adjustment; but Mees also made his piston revoluble upon the valve stem, and provided a suitable governor and connection to give it automatic revolution through a fraction of its circumference. If ports in the chamber wall and in the piston were of the same width (circumferential extent), the result was that when the governor, by increased speed, caused the piston to be revolved from that rotary position where the ports in the piston and in the chamber wall precisely registered, these ports were partly cut off and became of less width, so that their opening by the reciprocating motion of the piston provided a smaller area than before, and admitted less air and less gas; hence there was a smaller quantity of explosive mixture, less compression, less force in the explosion, and an automatic tendency to diminish speed. The slowing down of the engine would carry the reverse result through the governor to these ports and tend to increase the speed.

In his drawings and specification, Mees showed and described three alternative forms. In one of them, the gas ports and the air ports were of the same circumferential width, and so placed that both began to close at the same instant, and the rotary motion of the piston would, therefore, close both air and gas ports in precisely the same proportion, from the beginning to the end of the closure. This was quantity control. In another form, the piston was shorter and its reciprocation did not reach or affect at all the air ports, which remained constantly open, but in this longitudinal motion it opened and closed the gas ports, and in its rotary motion it throttled them. This gave a quality control. In still other drawings and descriptions, Mees showed a third form which combined the two control methods. The piston opened and closed simultaneously the air and gas ports, but the latter were circumferentially wider than the former, whereby the throttling action was exerted first upon the gas ports alone and then upon both simultaneously. In this form, as the speed became too great, the gas supply would first be lessened and the quality and explosive power of the mixture diminished; and

after this quality regulation had taken due effect, if the speed were still too high, both air and gas would be simultaneously reduced and the quantity of the charge lessened.

With this description of Mees' invention, his claims will be intelligible. There are nine. The first four and the ninth call for many details and seem to be specific in form. Only the remaining claims, 5, 6, 7, and 8, are in suit. They are as follows:

"5. In a valve motion for gas motors an inlet valve, a piston valve K, controlled simultaneously with the said inlet valve by a cam making an invariable stroke and revoluble by the governor of the motor.

"6. In a valve motion for gas motors an inlet valve, a piston valve K controlled simultaneously with the said inlet valve by a cam and revoluble by the governor of the motor, said piston valve having gas ports and air ports and adapted to throttle the air and gas supply for the cylinder simultaneously.

"7. In a valve motion for gas motors, a piston valve K moved simultaneously with the inlet valve E and revoluble by the governor of the motor said piston valve having gas ports m' and air ports i', and being adapted to throttle the air and gas supply for the cylinder simultaneously and in equal parts.

"8. In a valve motion for gas motors an inlet valve, a piston valve K controlled simultaneously with the said inlet valve by a cam making an invariable stroke and revoluble by the governor of the motor, said piston valve having gas ports and air ports and adapted to throttle the air and gas supply for the cylinder simultaneously, the said gas ports being constructed to be closed before the closing of said inlet valve, whereby the piston valve acts simultaneously as a regulating device and as a mechanically controlled closing means for the gas ports."

For convenience, we call the longitudinal motion of the piston "reciprocating" and the rotary motion "revolving," though neither term is exclusively accurate.

J. S. Green, of East Pittsburgh, Pa., and E. W. McCallister, of Cincinnati, Ohio (Paul Synnestvedt, of Pittsburgh, Pa., of counsel), for appellants.

Isaac B. Owens, of New York City (Patrick A. Bolger, of New York City, of counsel), for appellee.

Before KNAPPEN and DENISON, Circuit Judges, and EVANS, District Judge.

DENISON, Circuit Judge (after stating the facts as above). [1] When we remember that Mees' device involves three functions, that of a cylinder inlet valve, that of a reciprocal slide valve cut-off for the gas or for the gas and air, and that of a rotary slide valve throttle for the gas or for the gas and air, the distinctions between these four claims are apparent. Claim 5 has no reference to throttling both air and gas. In effect, it calls only for a piston shut-off valve reciprocating simultaneously with the inlet valve and revolving to throttle either gas or air. Claim 6 further specifies that the controlling means should act simultaneously upon the air and gas supply. Claim 7 is like claim 6, but it has the further limitation that the simultaneous throttling of the air and gas supply shall be in equal parts. Claim 8 also provides for simultaneous throttling of air and gas (like 6) but contains an additional limitation pertaining to the longitudinal or shut-off motion of the valve, viz. that the gas ports should be closed before the closing of the inlet valve.

We have to meet the usual questions of validity and scope, and we may go at once to that one of the earlier patents which, when

each one is considered by itself, most closely approximates Mees' general thought. This is the German patent to Grohmann, of October 11, 1890. This regulated the speed of the engine by a method not yet mentioned, known as the "hit and miss" method, in this variety of which, when the engine speed became too high, the governor caused the gas ports to be wholly closed, whereby the suction stroke took in air only, and an explosion was cut out. Grohmann has a cylindrical chamber with air and gas ports in its walls, and which is located in close proximity to what is claimed to be the inlet valve, and through which chamber the stem of this valve passes axially. He also has a piston valve carried by and reciprocating with the inlet valve stem, having ports registering with the gas ports in the chamber wall and opening and closing them, and being revoluble on the stem under governor control. The differences between Grohmann and Mees are four: (1) The so-called inlet valve does not open directly into the working cylinder but into a supplementary chamber, the passage between which and the working cylinder is a part of the time closed by another valve so that the charge may receive compression in this supplementary chamber, but which other valve is open at the moment of explosion, the supplementary chamber and the working cylinder then being one continuous space. Plaintiffs' counsel insist that this Grohmann valve, the stem of which carries the piston, is not the inlet valve of Mees. (2) The gas ports are either wholly opened or wholly closed by the governor action, thus making "hit and miss" control as above stated. (3) The cylindrical chamber, in which the piston reciprocates and revolves, is a short distance above the inlet valve, instead of extending thereto, and is separated by a perforated diaphragm from the space immediately above the inlet valve. The result is that gas only is received into this cylindrical chamber, which does not serve as a mixing chamber at all, and that the gas passes into the mixing chamber through the perforations in the diaphragm which are never closed, but the air passes into the mixing chamber through always open ports. (4) The gas and air are not simultaneously throttled.

It is insisted that claim 5 reads upon Grohmann, and is therefore invalid. Plaintiffs' counsel is charged with admissions to this effect; but, on the contrary, the record shows that, while frankly conceding the language of the claim to be capable of such a reading, he contended that it should not be so interpreted, and that, when rightly construed, it was valid. The file wrapper history almost compels the conclusion that this claim should not be read upon Grohmann, because Grohmann was cited and considered, and, in spite of this reference, the claim was allowed. It follows that both the Patent Office and Mees must have joined in the intent that the claim should not be so read as to make a device like Grohmann an infringement; but this conclusion does not necessarily imply that the claim is valid. If we say that its calls for the inlet valve and the piston valve rightly imply any one of the first three distinctions above recited, we must think that no one of the three involves invention in any sense sufficient to sustain claim 5, with any construction of which the language of claim 5 is capable. To change from the hit and miss method is only to

close the ports gradually instead of quickly, and the gradual closing was very common; in every substantial sense Grohmann's so-called inlet valve is the equivalent of that valve in Mees—that is, in every sense which pertains to the substantial utility of Mees' conception; and the entrance of the gas to the mixing chamber is both shut off and throttled by Grohmann's piston valve, in spite of the presence of the perforated diaphragm between the piston and the inlet valve. Each of these changes is, and all put together are, so unsubstantial in form and so negligible or so old in result that invention cannot be predicated upon them alone. We conclude that claim 5 is invalid.

The remaining question of validity is whether the limitation to a simultaneous throttling of air and gas ports, as found in claims 6, 7, and 8, imparts patentability. It plainly would, if it was new in itself, but since it had been accomplished in other associations, the question becomes more doubtful. The record presents several earlier patents which throttled air and gas simultaneously. In one (Crossley, British), there was a piston valve in a cylindrical casing with registering air and gas ports, the valve was rotated continuously through connection with a rotating part of the engine and it was reciprocable slightly under governor control, this longitudinal motion throttling both air and gas ports. This piston valve was not on or associated with a cylinder inlet valve, but was constantly open into a mixing chamber, from which passages extended to the various cylinder heads. In another (Tangyes, British), a valve of this form was rotated under governor control and thereby throttled air and gas ports simultaneously, but it had no reciprocating motion, and it also was always open into mixing chambers at a distance from the cylinder inlet valves. In others (e. g., Klein), air and gas were both throttled, not by any rotary motion of the piston, but by regulating the extent of its longitudinal stroke. It would not be demonstrably wrong to say that there was no invention in adding to the Grohmann device the additional and known modifications by which a piston valve would throttle both air and gas instead of gas alone; but we cannot be satisfied to adopt that conclusion. It is not merely a substitution of an equivalent for one element of Grohmann; adding this function to Grohmann involves considerable reorganization. His diaphragm will be unnecessary and naturally discarded. His cylindrical chamber must be extended so as to receive the air ports, the piston correspondingly extended and provided with ports and the air entrance passages rebuilt. This combination in one structure, unquestionably first made by Mees, of the inlet valve and its stem, the piston valve in immediate association with it, reciprocating with it to open and shut both air and gas ports with each suction stroke and revoluble under governor control to throttle both air and gas ports, had considerable theoretical operating advantages over any previous combination, and at least some practical advantages; the Grohmann patent was published in 1890, and, although there was great activity in this art during the intermediate 13 years, no one before Mees had thought of modifying it as he did; the plaintiff, a large manufacturer of gas engines of this general class, has either found this device desired or has thought proper to supply it in some of the largest in-

stallations in the country; and all competing manufacturers, until defendant's appearance, had acquiesced in the monopoly. In the light of these things, we think claims 6, 7, and 8 are valid. The distinctive feature of claim 8, as compared with 6, is the advance closing of the gas port. It is a mistake to suppose that the "whereby clause" of 8 refers alone to this advance closing; it refers to the whole claim, and might as well have been used on claim 6. Since this distinctive feature was not new, and is not more appropriate to the combination of claim 8 than it is to old forms, we are not clear that there is patentable distinction between 6 and 8. However, this seems of no practical importance.

In the conclusions so far stated, we concur with the court below. It remains to consider those limitations of claims 6, 7, and 8 which affect the question of their application to defendant's device. We find nothing in the specification or claims or state of the art requiring that the air ports should be of the same longitudinal extent as the gas ports, or that the air ports should separately or collectively have the same area as the gas ports.[1] Some figures of the drawing show only two air ports and two gas ports and all seem to be of the same size, but the specification says nothing about this. Obviously they would not be of the same size, unless it was desired to have one-half gas and one-half air. It appears that, in order to get an explosive mixture, these proportions must be varied according to the richness of the gas, and it is not to be supposed that Mees was ignorant of what everybody knew. His invention had nothing to do with the initial or predetermined proportions of gas and air, there was no occasion for him to describe or show anything on that subject and there can be no reasonable inference, except that he contemplated that the engine builder would proportion or adjust the relative areas of air inlets and gas inlets as the builder might think best.

It is not directly important if the suction stroke does not open or close air and gas ports at the same instant or to the same extent. The mixture is formed by all the air and gas entering through all the ports uncovered during the whole stroke. The word "simultaneously" in its first use in each of these three claims, has no reference to air and gas ports, but only to the concurrent reciprocation of inlet valve and piston valve.

[2] Nor can we imply this limitation (to simultaneous and equal uncovering by each stroke) from the stated limitation to simultaneous throttling of air and gas. The word "simultaneous" does not imply absolute synchronism from beginning to end; it has some elasticity. Events may be substantially or relatively simultaneous, although not absolutely so. It could hardly be denied that racing horses go around the track simultaneously, although a stop watch may show slight differences between them on the way and at the finish. In these engines, the reciprocating opening motion is very rapid; the rotary

---

[1] It is said that the examiner's letter stated that Mees' air and gas ports must be "formed in a certain way," and that Mees did not protest; but this was with reference to a specific claim and construction, later abandoned and canceled from the drawings.

throttling motion is relatively slow. It is true that if the gas ports are not all opened at the same time and to the same extent as the air ports are, but the two are so arranged longitudinally that the reciprocating action opens one, wholly or partly, before it does the other, there will be an instant when rotary motion of the piston may be throttling one but not the other, because at the other there will not, at that instant, be registration. But this is only in theory, and we can almost say only in imagination. Assuming (perhaps not with perfect accuracy) that the opening motion of the inlet valve occupies one-fourth of the time between explosions, and that 600 revolutions per minute is an ordinary speed, this opening motion will consume one-fifth of a second. If we further assume that during some fraction of the opening stroke the throttling action was affecting air ports and not gas ports, we have a very minute period of time during which the throttling is proceeding nonsimultaneously; and even when the port that was not rotarily throttled because it was longitudinally closed is later opened, it opens into a throttled condition; in a very fair sense, it had been throttled while closed. It is to be observed, also, that during three-fourths of the time, all the ports are closed, and yet, the throttling action to which the specification and claims refer as "simultaneous" is proceeding. This observation confirms the conclusion that completely and constantly concurrent throttling from beginning to end was not contemplated.

Comparison of plaintiffs' patent with the specific form used by defendant also confirms this same conclusion. The patent drawings show some instances where air and gas ports will have the same open area all the time, and show another form where they will not, but where the throttling motion in its rotary progress will be closing an open air port both before and after it is closing an open gas port. It is true this alternative construction may have special reference to claim 5, but at least it illustrates that Mees intended to adjust the longitudinal position of air and gas ports as might be advisable. Defendant's form made express provision for such adjustment manually. His air and gas ports in his piston valve were of the same longitudinal extent, but in his stationary cylindrical chamber the gas ports could be varied from nothing up to a size as large as ports in the piston. It follows that the effective gas and air ports (the registering areas of chamber ports and piston ports) in defendant's device might be of precisely the same size, or that the gas ports might be of much less size, according to the quality of gas that was to be used in a given installation. The particular use which was proved was with a rich gas, and the adjustment was such that a vertical stroke took in 19 parts of air to 1 of gas; but Mees, who specifies nothing on this subject, could just as well build his device to take in 19 parts of air and 1 part of gas (as defendant did), and the defendant could just as well adjust its existing device to take in equal parts of air and gas (as Mees did). It is not reasonable to suppose that a dissimilarity so fortuitous can be vital.

[3] While we have conceded that the question whether there was invention in bringing into an existing combination the simultaneous throttling function was a close question, that concession does not

lead to any particularly narrow construction of the word "simultaneous." Mees did not invent some novel supersynchronism in the place of an imperfect one theretofore existing, so that he should be confined to that extreme degree of perfection. He first disclosed—in this combination—any kind or degree of simultaneous action. Since a single suction stroke and the following single explosion could have no appreciable effect upon the engine's speed and the reflex action of the governing devices, but any such effect must come from a considerable number of successive strokes and explosions, it is additionally clear to us that the patent does not contemplate a single stroke as the unit concerning which simultaneous throttling must exist, but contemplates rather that substantial or appreciable period of time during which a rotary piston motion is in progress, or that part of the circle covered thereby, and that if during or by that completed unit both air and gas ports have been throttled so that the total area of each is less for those reciprocating strokes made thereafter than it was for the reciprocating strokes made theretofore, the throttling of both has been simultaneous, and Mees' invention, in this respect, has been appropriated.

"In equal parts," as used in the specification and in claim 7, necessarily means "in equal fractions" or "in equal proportions," and not "in equal area." It is the whole theory of the patent, so far as it pertains to a throttling "in equal parts," that this is for the express purpose of maintaining a constant quality; and if it were considered that whenever two square inches are throttled off on the air ports two square inches must also be cut off on the gas ports, it will result that the quality would always be changed—excepting in the one possible, but rather improbable, instance where air and gas ports were of the same initial total area.

Giving to claims 6, 7, and 8 the construction which we have approved in the foregoing paragraphs, infringement by the defendant is not to be questioned.

If, within a time to be fixed by the District Court, plaintiffs disclaim claim 5 and file in that court certified copy of such disclaimer, they may have the usual decree for injunction and accounting on claims 6, 7, and 8. They will recover the costs of this court, but not of the court below. Herman v. Youngstown (C. C. A. 6) 191 Fed. 579, 587, 588, 112 C. C. A. 185.

The decree is set aside, and the case remanded for further proceedings in accordance herewith.