[Civ. No. 4008. Fourth Dist. Mar. 7, 1950.]

ANTHONY J. THOMAS, as Administrator, etc., Appellant, v. ALICE ANDERSON, as Administratrix, etc., et al., Respondents.

C. Ray Robinson, W. Eugene Craven and Margaret A. Flynn for Appellant.

Crossland & Crossland, Wm. C. Crossland and Robert S. Crossland for Respondents.

MUSSELL, J.—This action to quiet title arose out of the circumstances attending the deaths of John F. Thomas and Rhomus C. Sturgeon, who, as joint tenants, owned the real and personal property herein involved. Both men died between the hours of 9 and 10 o'clock on the evening of September 2, 1947, and plaintiff appeals from the judgment in which it was decreed that Rhomus C. Sturgeon survived John F. Thomas; that upon his death his joint tenancy interest terminated and the title to the property vested in Rhomus C. Sturgeon.

The controversy involves the application of the provisions of section 296.2 of the Probate Code, which are as follows:

''Where there is no sufficient evidence that two joint tenants have died otherwise than simultaneously the property so held shall be distributed one-half as if one had survived and one-half as if the other had survived.''

Plaintiff contends (1) that the evidence is not sufficient to support the finding of the trial court that the two deaths in this instance did not occur simultaneously; and (2) that under section 296.2 of the Probate Code, deaths are simultaneous if they occur substantially or approximately at the same time.

Mr. Thomas and Mr. Sturgeon were elderly gentlemen with heart ailments and were living in a home owned by them in the city of Fresno, and on the evening of September 2d, at about 9 o'clock, they were observed sitting together on the front porch of their home. Shortly thereafter, Mrs. Sanders, who lived next door, heard Sturgeon, who was in the backyard, say ''What is the matter, John, what is the matter.'' She ran outside and Sturgeon asked her to call the doctor. She called Mr. and Mrs. Shattuck, who lived next door, and Mr. Shattuck ran over while Mrs. Sanders went inside to use the phone.

Mr. Shattuck testified that when called by Mrs. Sanders, he went over to the house and saw Mr. Thomas lying on the ground on his back, face up; that Sturgeon was leaning over and had his head lowered to Mr. Thomas' chest; that Sturgeon was feeling or handling Thomas' wrist and that Sturgeon asked him to call a priest; that Shattuck turned Thomas over, got him in position and gave him artificial respiration for a few minutes until Thomas took about three or four gasping breaths; that they were "gasping breaths, like he was fighting to get air, that is the way I'd say, gasping, striving, he was fighting for air." Mr. Shattuck further testified that he had been required to take first aid in the Army and also for the company for which he worked and was familiar with the locations of the pulse, both from the head and the wrist; that he was present and had taken pulses of people who had passed away; that he felt Thomas' temple for a pulse and did not feel any; that at about the precise moment when he was feeling for a pulse, he heard a thump or falling sound in the house; that after he felt for the pulse at the temple, he felt for a pulse at the wrist; that he could not feel any pulse at the wrist at all and that Thomas started to turn and discolor very readily; that he put his face down to Thomas' chest and to his mouth; that there was absolutely no breathing; that he then proceeded into the house and found Sturgeon lying with his head on the piano pedals; that Sturgeon was then breathing; that he proceeded to turn Sturgeon over on his back, straighten him out on the floor and give him artificial respiration; that he continued to give artificial respiration until he could no longer hear or see breathing; that he was still working over Sturgeon when the fire department arrived and that Sturgeon appeared to be still alive; that he was breathing, his breaths were far apart, or were not natural but he was alive.

The fire chief of the city of Fresno, who was experienced in rescue work and in first aid, testified that he arrived at the scene at about 9:36 p. m., and saw Thomas lying on the ground, back of the house; that he could not find any pulse beat; that Thomas' face had become discolored and that the body was cool; that "if the body is warm, there is a faint hope of reviving a person; if it is cold, there is no hope"; that they had just started to set up their resuscitating machine, when "they" were informed that there was another man in the house that "they" thought was still alive; that they went to work on Mr. Sturgeon, who was lying on the floor; that he examined

him, felt his wrist; that Sturgeon was warm and had good color; that he detected a slight pulse.

A fire department captain, who was also experienced in first aid and rescue work, testified that he examined a man lying on the ground in the backyard, picked up his hand and that when he could detect no pulse, he took his flashlight out, opened the eyes and flashed the light into them; that he could get no movement in the eyes; that the face started to turn a dark ruddy color; that he was not breathing as far as the witness could determine; that he then sent the squad into the house and went in himself, where he saw Sturgeon on the floor. Sturgeon was warm and his color was good; that they put the resuscitator on Sturgeon and started to work on him and that he could detect a pulse beat, a throb in his wrist.

A sister of Mr. Sturgeon testified that about 9:30 on the night of the tragedy, Sturgeon called her on the 'phone and that his first words were ''Della, John is dead.''

Dr. Katz, the physician who was called to the scene by the police department, was not present in court at the trial but it was stipulated that if present, he would testify that he is a duly licensed, practicing and qualified physician and surgeon in the city of Fresno; that on the evening of September 2, 1947, he was notified by the police department to go to 1427 La Salle Street in Fresno in answer to an emergency call; that when he arrived at the house, he found two bodies; one being that of Rhomus Clare Sturgeon and the other that of John F. Thomas; that the body identified to him as the body of Mr. Thomas was in the yard and the one identified to him as the body of Mr. Sturgeon was in the house; that he immediately examined both bodies; that he found both men dead and that he, as a physician and surgeon, was not able to determine medically, or otherwise, the exact hour or minute of the death of either of them.

Dr. William J. Reynolds, who was not present at the scene on September 2, 1947, testified that he had attended Mr. Sturgeon prior to his death and had last seen him approximately a week before he died; that he signed a medical certificate in which the cause of death was given as coronary occlusion, and that he also attended Mr. Thomas during his lifetime and signed the certificate that the cause of death of Mr. Thomas was cardiac failure, possibly ventricular fibrillation, rheumatic heart disease with aortic insufficiency, etc.; that he did not know the exact hour of the death of either man and that he knew of no means by which that could be determined.

He further testified that the fact that one body might be a little cooler than the other would not be a determining factor in ascertaining which man had died first; that he did not think that there would be perceptibly enough change in temperature in a few minutes to be able to determine correctly; that the coolness would depend greatly on the amount of moisture that was on the skin.

We conclude that there was substantial evidence to support the trial court's finding that John F. Thomas predeceased Rhomus C. Sturgeon and that Rhomus C. Sturgeon survived the death of John F. Thomas.

In the *Estate of Loucks,* 160 Cal. 551 [117 P. 673, Ann.Cas. 1913A 868], in a proceeding for the distribution of the estate of a deceased person which involved the determination of the question of survivorship of two persons who were killed in a collision between a railway train and the automobile in which they were passengers, the court held that the fact of survivorship must be established by a preponderance of the evidence, and stated, at page 554:

"In the case at bar there was a conflict of evidence and the court, after hearing all of the testimony, found the essential fact to be that the child Thelma survived her father. We do not see that this differs from the ordinary case wherein conflicting testimony has been given, and unless we find, upon a study of the record, that in no rational view of the evidence was the court below justified in the conclusion reached, we must sustain the findings of that court."

In the instant case the question as to which of the two men died first was a question of fact for the determination of the trial court, and where, as here, it was supported by substantial evidence, the finding is binding upon us. (*Dillard* v. *McKnight,* 34 Cal.2d 209, 223 [209 P.2d 387].)

 The contention of the plaintiff that under section 296.2 of the Probate Code deaths are simultaneous if they occur substantially or approximately at the same time is untenable. The word "simultaneously" has been defined as follows:

"Simultaneously. In a strict sense, at precisely the same instant; but in a broader sense, at the same time; not at the same instant but at substantially the same time."

And the word "simultaneous" has been defined as:

"Simultaneous. A word of comparison meaning that two or more occurrences or happenings are identical in time."

Appellant cites *American Surety Co. of New York* v. *Mosher* (1936), 48 Ariz. 552 [64 P.2d 1025, 1030], as holding as follows:

"The word 'simultaneously' . . . is not always construed to require absolute synchronism from beginning to end. The events may be substantially or relatively simultaneous without being absolutely so . . . so long as the two acts required are performed so that they will not be considered as separate in time as a matter of law, the actions are simultaneous. . . . Practically speaking, it means that the acts are done on the same day, since the law ordinarily does not separate a day into parts."

And the case of *Westinghouse Mach. Co.* v. *C. & G. Cooper Co.* (CCA-6, 1917), 245 F. 463, 468 [157 C.C.A. 625], wherein it is stated:

"It could hardly be denied that racing horses go around the track simultaneouly, although a stop watch may show slight differences between them on the way and at the finish."

The first case cited involved a construction of the word "simultaneously" used in connection with a rule of court which required that a formal judgment be rendered and filed by the court. It was held that if the two acts were done on the same day, they were performed "simultaneously" as the law does not ordinarily divide a day into parts.

As to the last case, it no doubt is a fact that racing horses do go around the track simultaneously, when they are running at the same time. However, if one horse reaches the finish line before another, it cannot be said that they finish simultaneously.

As defined in Black's Law Dictionary, 3d edition, death is the cessation of life; the ceasing to exist; defined by physicians as a total stoppage of the circulation of the blood, and a cessation of the animal and vital functions consequent thereon, such as respiration, pulsation, etc.

While it may be said that persons who are alive at the same time are living simultaneouly, death occurs precisely when life ceases and does not occur until the heart stops beating and respiration ends. Death is not a continuing event and is an event that takes place at a precise time.

We conclude that there was sufficient evidence to support the court's finding that there was an interval of time between the deaths of Mr. Thomas and Mr. Sturgeon

and that they did not die "simultaneously" within the meaning of section 296.2 of the Probate Code.

Judgment affirmed.

Barnard, P. J., and Griffin, J., concurred.

A petition for a rehearing was denied March 29, 1950, and appellant's petition for a hearing by the Supreme Court was denied May 4, 1950.