In the Matter of the ESTATE OF Cecil A. HUGHES, Deceased, Gloria Jean Hughes, Personal Representative, and the Estate of Suzanne DuPerier Hughes, Deceased, Gene Rankin, Personal Representative.

No. 14868.

Missouri Court of Appeals, Southern District, Division Two.

Sept. 4, 1987.

Kenneth W. Johnson, Springfield, for appellant.

J.T. Magness, Lois M. Zerrer, Springfield, for respondent.

HOGAN, Judge.

Cecil A. Hughes shot and killed his wife, Suzanne DuPerier Hughes, and then committed suicide. Probate estates were opened for both Cecil and Suzanne and administration on both estates was commenced in the Probate Division of the Circuit Court of Greene County. By stipulation and motion, the probate division was called on to decide whether: a) one decedent survived the other, or b) the decedents died simultaneously within the meaning and intent of the Simultaneous Death Law, now codified as Chapter 471, RSMo 1986.[1] The trial court found, inter alia, that Suzanne survived Cecil, and the personal representative of Cecil's estate has appealed. We affirm.

John Christopher Rankin, the male child of decedent Suzanne Hughes and one Gene Carlos Rankin, lived with his mother on July 16, 1985. John was then 13 years of age. About 7:30 a.m., John "heard the doorbell ring." Cecil was at the door. Cecil came in the house. Suzanne asked if "[Cecil] wanted some coffee," but very shortly thereafter she "started yelling and screaming."

John "ran to the kitchen door" and saw Cecil's back. Suzanne told John to run. John "stood there [a moment] and then ... heard [a] gunshot." He then ran into his mother's bedroom. When he got to the bedroom, John heard what he thought was a door closing. John thought Cecil had left. He dialed the police emergency number and reported that his mother had been shot.

John then went to see about his mother. He saw Cecil, "laying in the floor in the kitchen with his head just outside the doorway on the carpet." Cecil was bleeding, and he had a "gun" in his hand.[2] He had

---

1. The pleadings are very informal, but no issue is presented respecting the sufficiency of any pleading or notice of the proceeding. In *form*, the pleadings were aided by the provisions of § 472.080.2, RSMo 1986. This provision reads: "No defect of form or substance in any document invalidates any proceedings after judgment on the document." We assume that notice under the provisions of § 472.100.8, RSMo 1986, which appears to have been given, was sufficient.

2. This handgun was identified as a five-shot Smith and Wesson Model 36—it is a .38 caliber handgun and is also called a "Chief's Special."

shot himself through the head. John found his mother in the utility room "lying right in front of the washer." John then testified as follows:

"Q. Was she on her back?
A. She was on her side.
Q. Okay. Which side?
A. Left side.
Q. What did you do then?
A. I rolled her over.
* * * * * *
Q. Well, did you—*Was she breathing?*
A. *Yes.*
Q. *How do you know?*
A. *Her chest was moving, and I could hear her.*
Q. *What did it sound like?*
A. *It was ... real raspy.*
Q. *About—About how long were you there? Can you estimate that?*
A. *Maybe two, three minutes.*
Q. When you were talking to her, did she ever say anything to you?
A. No.
Q. Did she move?
A. No.
Q. Did you notice she was bleeding?
A. Yes.
Q. Did you—Now, she, was breathing for two or three minutes; *what happened then?*
A. *She quit.*" (Our emphasis.)

John then tried to give his mother mouth-to-mouth resuscitation. He observed that:

"A. Her chest would rise, and I would hear a gurgling noise coming from the hole.
Q. The wound? Did you see the blood going out?
A. No.
Q. Did—Then, did she breathe any after that?
A. She took one breath, and then—
* * * * * *
Q. ... Did she breathe anymore after that?
A. No."

The proponent also had the evidence of Dr. Erwin Busiek, Medical Examiner of Greene County. Dr. Busiek stated that he arrived at Suzanne Hughes' residence about 8:20 a.m. He examined Cecil first because Cecil was close at hand. Dr. Busiek's examination of Cecil's corpse disclosed that Cecil "had a through-and-through bullet hole [in his head], entering the right side of the head and exiting the left." This meant that the bullet had passed through Cecil's brain. Dr. Busiek was asked if he had seen bullet wounds like Cecil's on other occasions; he replied "[m]any times." He was then asked the probable effect of such a wound. His answer was "In gunshot wounds of this type and location, death is almost always—not always, but almost always—instantaneous." The doctor's opinion was that most likely, Cecil died instantly.

Describing the wounds he found when he examined Suzanne, Dr. Busiek testified that a "bullet entered Suzanne in the left back area ... and exited in the left upper outer quadrant of the chest." He believed it was possible that Suzanne lived after she was shot. Being asked his opinion concerning the immediate cause of Suzanne's death, the doctor stated that "she became unable to breathe and to exchange air because of [the] presence of blood in the lungs, which obstructed breathing." Dr. Busiek was of the opinion that the bullet which passed through Suzanne's chest did not enter her heart.

Upon cross-examination, Dr. Busiek was shown a photograph which indicated that Suzanne might have sustained more than one gunshot wound. The doctor did not remember seeing more than one gunshot wound, but he stated that if the photograph indicated a second wound,[3] the second wound was not such as to change his opinion that Suzanne had not been shot in the heart.

Other evidence was received, but in the view we take of this appeal, it need not be synopsized. The primary question before the probate division was whether Cecil and Suzanne died simultaneously, or one survived the other. In our view, there was substantial evidence that Suzanne survived Cecil for a very short time.

3. The photograph, received as Exhibit R3, is not before us.

Appellant's first three points are directed to the sufficiency of the evidence. These points overlap. Only the first point need be addressed separately. In her first point, the appellant argues that the trial court erred, to her prejudice, in allowing Officer Steve Blunt to testify that Cecil's head wound was instantaneously fatal. Appellant's objection is that Officer Blunt was not qualified to testify concerning the effect of Cecil's head wound. In connection with this point, it is sufficient to say that in a court-tried case, it is practically impossible to predicate reversible error on the erroneous admission of evidence. *In re Estate of Black,* 693 S.W.2d 899, 901 (Mo. App.1985). A party advancing such an argument must demonstrate a lack of competent evidence to support the decree. *Green v. Stanfill,* 641 S.W.2d 490, 491 (Mo.App. 1982). In this case, there was evidence, aside from Officer Blunt's testimony, from which the court could have concluded that Suzanne survived Cecil.

One of the problems inherent in this case is that the development of medical technology has complicated the definition of that condition called "death." Many of the older precedents simply accepted the definition found in Black's Law Dictionary, i.e., "The cessation of life; the ceasing to exist; defined by physicians as a total stoppage of the circulation of the blood, and a cessation of the animal and vital functions consequent thereon, such as respiration, pulsation, etc." [4] Nowadays, the development of "life-support systems" and the increasing use of human organ transplants have made the definition of "death" more complex.[5] Some of the modern studies emphasize spontaneous respiration as an indication that a person is alive.[6] Also, older precedents attached significance to the fact that one of the two putative commorientes received an injury which would probably produce instant death *if* there was evidence that the instantaneously fatal wound was the first inflicted.[7] Bearing in mind that in a court-tried case, the trial court has leave to disbelieve all of the testimony of any witness, or to believe it in part and reject it in part, *Matter of the Estate of Viviano,* 624 S.W.2d 130, 133 (Mo.App.1981), the question before us is whether the trial court could reasonably have concluded that Suzanne survived Cecil, even for a short period. If the proof is sufficient, one second would be enough. *Schmitt v. Pierce, supra,* n. 3, 344 S.W.2d at 124.

The narrative of the murder and suicide was, perhaps, not conclusive of the sequence of events, and the medical examiner avoided being certain about survivorship. Nevertheless as we read the transcript, it is a reasonable conclusion that Cecil shot Suzanne and then shot himself. An expert's testimony indicating that a certain result is scientifically possible is admissible to aid the trier of fact in determining the reasonable inferences to be drawn from the facts. *Kimmie v. Terminal R.R. Ass'n of St. Louis,* 334 Mo. 596, 605, 66 S.W.2d 561, 565[9] (1933); *Immekus v. Quigg,* 406 S.W.2d 298, 303 (Mo.App.1966); *Bertram v. Wunning,* 385 S.W.2d 803, 805 (Mo.App.1965). In this case, the only matter really in controversy was the sequence of events. John did not see Cecil shoot himself, but Dr. Busiek's testimony was that a gunshot wound straight through the head is almost always fatal. John thought he heard two shots. Suzanne continued to breathe spontaneously for a short time thereafter. The fact of survivorship requires no higher degree of proof than any other fact in the case, *Schmitt v. Pierce, supra,* n. 1, 344 S.W.2d at 123, and in our view, the nature of Cecil's wound precludes any rational conclusion that he shot himself and then shot Suzanne. The evidence was

4. *Schmitt v. Pierce,* 344 S.W.2d 120, 133 (Mo. banc 1961); *Smith v. Smith,* 229 Ark. 579, 317 S.W.2d 275, 279 (1958); *Thomas v. Anderson,* 96 Cal.App.2d 371, 215 P.2d 478, 481–82[4] (1950).

5. See, in this connection, A Capron and L. Kass, A Statutory Definition of the Standards for Determining Human Death: An Appraisal and A Proposal, 121 U.Pa.L.Rev. 87 (1972). [Hereinafter Capron and Kass.]

6. See Capron and Kass, pp. 89–90, n. 11, citing "A Definition of Irreversible Coma," 205 J.A. M.A. 337 (1968).

7. See J. Tracy and J. Adams, Evidence of Survivorship in Common Disaster Cases, 38 Mich.L. Rev. 801, 824 (1940).

sufficient to establish Suzanne's survivorship.

Our holding makes an extensive discussion of the probate division's alternative ruling unnecessary. As an alternative ruling, the probate division held that Suzanne's heirs were vested with title to the property which she and Cecil held by the entirety and as joint tenants, because one who intentionally and feloniously causes the death of another cannot acquire property by that death. The general principle involved was extensively discussed by this court in *Baker v. Martin,* 709 S.W.2d 533 (Mo.App.1986), but it has no application here.

 It was stipulated by the parties that on July 16, 1985, Cecil and Suzanne Hughes held two parcels of real property as tenants by the entirety and one parcel of realty as joint tenants. An estate in tenancy by the entirety is not held by moieties or halves but both husband and wife hold the entire estate as a single person. Therefore, a surviving spouse succeeds to the whole estate, not by virtue of survivorship, but because there is no other spouse with whom to share the title. *State ex rel. State Highway Commission v. Morganstein,* 649 S.W.2d 485, 488 (Mo.App.1983); *In re Estate of King,* 572 S.W.2d 200, 211 (Mo.App.1978). And, the most distinctive characteristic of a joint tenancy is that of survivorship; whether a joint tenant ever becomes the sole owner is contingent upon his becoming the survivor. *In re Estate of King,* 572 S.W.2d at 211. The survival of one of the decedents for a short time after the death of the other was sufficient here for the survivor to act as a conduit of title to the survivor's heirs, whether the realty was held by the entirety or jointly, and Suzanne's heirs succeed to the three parcels of realty in question. *Cf. Schmitt v. Pierce,* 344 S.W.2d at 123–26[3]. The judgment is affirmed.

PREWITT, P.J., and FLANIGAN and MAUS, JJ., concur.