KOGAN, Justice.
We have for review an order of the trial court certified by the Fourth District Court of Appeal as touching on a matter of great public importance requiring immediate resolution by this Court. We frame the issue as follows:[1]
Is an anencephalic newborn considered “dead” for purposes of organ donation solely by reason of its congenital deformity?
We have jurisdiction.[2] Art. V, § 3(b)(5), Fla. Const.

I. Facts

At or about the eighth month of pregnancy, the parents of the child T.A.C.P. were informed that she would be born with anencephaly. This is a birth defect invariably fatal,[3] in which the child typically is born with only a “brain stem” but otherwise lacks a human brain. In T.A.C.P.’s case, the back of the skull was entirely missing and the brain stem was exposed to the air, except for medical bandaging. The risk of infection to the brain stem was considered very high. Anencephalic infants sometimes can survive several days after birth because the brain stem has a. limited capacity to maintain autonomic bodily functions such as breathing and heartbeat. This ability soon ceases, however, in the absence of regulation from the missing brain.
In this case, T.A.C.P. actually survived only a few days after birth. The medical evidence in the record shows that the child T.A.C.P. was incapable of developing any sort of cognitive process, may have been unable to feel pain or experience sensation due to the absence of the upper brain,[4] and at least for part of the time was placed on a mechanical ventilator to assist her breathing. At the time of the hearing below, however, the child was breathing unaided, although she died soon thereafter.
On the advice of physicians, the parents continued the pregnancy to term and agreed that the mother would undergo caesarean section during birth. The parents agreed to the caesarean procedure with the express hope that the infant’s organs would be less damaged and could be used for transplant in other sick children. Although T.A.C.P. had no hope of life herself, the parents both testified in court that they wanted to use this opportunity to give life to others. However, when the parents requested that T.A.C.P. be declared legally dead for this purpose, her health care providers refused out of concern that they thereby might incur civil or criminal liability-
The parents then filed a petition in the circuit court asking for a judicial determination. After hearing testimony and argument, the trial court denied the' request on grounds that section 382.009(1), Florida Statutes (1991), would not permit a determination of legal death so long as the child’s brain stem continued to function. On appeal, the Fourth District summarily affirmed but then certified the trial court’s order to this Court for immediate resolution of the issue. We have accepted jurisdiction to resolve this case of first impression.

II. The Medical Nature of Anencephaly

Although appellate courts appear never to have confronted the issue, there already *590 is an impressive body of published medical scholarship on anencephaly.[5] From our review of this material, we find that anence-phaly is a variable but fairly well defined medical condition. Experts in the field have written that anencephaly is the most common severe birth defect of the central nervous system seen in the United States, although it apparently has existed throughout human history.
A statement by the Medical Task Force on Anencephaly (“Task Force”) printed in the New England Journal of Medicine[6] generally described “anencephaly” as “a congenital absence of major portions of the brain, skull, and scalp, with its genesis in the first month of gestation.” David A. Stumpf et ah, The Infant with Anencephaly, 322 New EngJ.Med. 669, 669 (1990). The large opening in the skull accompanied by the absence or severe congenital disruption of the cerebral hemispheres is the characteristic feature of the condition. Id.
The Task Force defined anencephaly as diagnosable only when all of the following four criteria are present:
(1) A large portion of the skull is absent.
(2) The scalp, which extends to the margin of the bone, is absent over the skull defect. (3) Hemorrhagic, fibrotic tissue is exposed because of defects in the skull and scalp. (4) Recognizable cerebral hemispheres are absent.
Id. at 670. Anencephaly is often, though not always, accompanied by defects in various other body organs and systems, some of which may render the child unsuitable for organ transplantation. Id.
Thus, it is clear that anencephaly is distinguishable from some other congenital conditions because its extremity renders it uniformly lethal. Id. Less severe conditions are not “anencephaly.” There has been a tendency by some parties and amici to confuse lethal anencephaly with these less serious conditions, even to the point of describing children as “anencephalic” who have abnormal but otherwise intact skulls and who are several years of age. We emphasize that the child T.A.C.P. clearly met the four criteria described above. The present opinion does not apply to children with less serious conditions; they are not anencephalic because they do not have large openings in their skulls accompanied by the complete or near total absence of normal cerebral hemispheres, which defines “anencephaly.” See id.
The Task Force stated that most reported anencephalic children die within the first few days after birth, with survival any longer being rare. After reviewing all available medical literature, the Task Force found no study in which survival beyond a week exceeded nine percent of children meeting the four criteria. Id. at 671. Two months was the longest confirmed survival of an anencephalic, although there are unconfirmed reports of one surviving three months and another surviving fourteen months. The Task Force reported, however, that these survival rates are confounded somewhat by the variable degrees of medical care afforded to anencephalics. Id. Some such infants may be given considerable life support while others may be given much less care. See id.
The Task Force reported that the medical consequences of anencephaly can be established with some certainty. All anence-phalics by definition are permanently unconscious because they lack the cerebral cortex necessary for conscious thought. Their condition thus is quite similar to that of persons in a persistent vegetative state. Where the brain stem is functioning, as it was here, spontaneous breathing and heartbeat can occur. In addition, such infants may show spontaneous movements of the extremities, “startle” reflexes, and pupils that respond to light. Some may show feeding reflexes, may cough, hiccup, or ex *591 hibit eye movements, and may produce facial expressions. Id. at 671-72.
The question of whether such infants actually suffer from pain is somewhat more complex. It involves a distinction between “pain” and “suffering.” The Task Force indicated that anencephaly in some ways is analogous to persons with cerebral brain lesions. Such lesions may not actually eliminate the reflexive response to a painful condition, but they can eliminate any capacity to “suffer” as a result of the condition. Likewise, anence-phalic infants may reflexively avoid painful stimuli where the brain stem is functioning and thus is able to command an innate, unconscious withdrawal response; but the infants presumably lack the capacity to suffer. Id. 672. It is clear, however, that this incapacity to suffer has not been established beyond all doubt. See id.
After the advent of new transplant methods in the past few decades, anencephalic infants have successfully been used as a source of organs for donation. However, the Task Force was able to identify only twelve successful transplants using anen-cephalic organs by 1990. Transplants were most successful when the anencephalic immediately was placed on life support and its organs used as soon as possible, without regard to the existence of brain-stem activity. However, this only accounted for a total of four reported transplants. Id. at 672-73.
There appears to be general agreement that anencephalics usually have ceased to be suitable organ donors by the time they meet all the criteria for “whole brain death,” i.e., the complete absence of brain-stem function. Stephen Ashwal et al., Anencephaly: Clinical Determination of Brain Death and Neuropathologic Studies, 6 Pediatric Neurology 233, 239 (1990). There also is no doubt that a need exists for infant organs for transplantation. Nationally, between thirty and fifty percent of children under two years of age who need transplants die while waiting for organs to become available. Joyce L. Peabody et al., Experience with Anencephalic Infants as Prospective Organ Donors, 321 New Eng. J.Med. 344, 344 (1989).

III. Legal Definitions of “Death” & “Life”

As the parties and amici have argued, the common law in some American jurisdictions recognized a cardiopulmonary definition of “death”: A human being was not considered dead until breathing and heartbeat had stopped entirely, without possibility of resuscitation. E.g., Thomas v. Anderson, 215 P.2d 478, 482 (Cal.App.1950); see Jay A. Friedman, Taking the Camel by the Nose: The Anencephalic as a Source for Pediatric Organ Transplants, 90 Colum.L.Rev. 917, 925-26 (1990).
However, there is some doubt about the exact method by which this definition was imported into the law of some states. Apparently the definition was taken from earlier editions of Black’s Law Dictionary, which itself did not cite to an original source. C. Anthony Friloux, Jr.,. Death, When Does I.t Occur?, 27 Baylor L.Rev. 10, 12-13 (1975). The definition thus may only have been the opinion of Black’s earlier editors.
We have found no authority showing that Florida ever recognized the original Black’s Law Dictionary definition or any other definition of “death” as a matter of our own common law.[7] Even if we had adopted such a standard, however, it is equally clear that modern medical technology has rendered the earlier Black’s definition of “death” seriously inadequate.[8] With the invention of life-support devices and procedures, human bodies can be made to breathe and blood to circulate even in the utter absence of brain function.
*592 As a result, the ability to withhold or discontinue such life support created distinct legal problems in light of the “cardiopulmonary” definition of death originally used by Black’s Dictionary. For example, health care providers might be civilly or criminally liable for removing trans-plantable organs from a person sustained by life support, or defendants charged with homicide might argue that their victim’s death actually was caused when life support was discontinued. Andrea K. Scott, Death Unto Life: Anencephalic Infants as Organ Donors, 74 Va.L.Rev. 1527, 1538-41 (1988) (citing actual cases).
In light of the inadequacies of a cardiopulmonary definition of “death,” a number of jurisdictions began altering their laws in an attempt to address the medical community’s changing conceptions of the point in time at which life ceases. An effort was made to synthesize many of the new concerns into a Uniform Determination of Death Act issued by the National Conference of Commissioners on Uniform State Laws. The uniform statute states:
An individual who has sustained either (1) irreversible cessation of circulatory and respiratory functions, or (2) irreversible cessation of all functions of the entire brain, including the brain stem, is dead. A determination of death must be made in accordance with accepted medical standards.
Unif. Determination of Death Act § 1, 12 U.L.A. 340 (Supp.1991). Thus, the uniform act both codified the earlier common law standard and extended it to deal with the specific problem of “whole brain death.” While some American jurisdictions appear to have adopted substantially the same language, Florida is not among these. Friedman, supra, at 928 nn. 58-59.
Indeed, Florida appears to have struck out on its own. The statute cited as controlling by the trial court does not actually address itself to the problem of anencephalic infants, nor indeed to any situation other than patients actually being sustained by artificial life support. The statute provides:
For legal and medical purposes, where respiratory and circulatory functions are maintained by artificial means of support so as to preclude a determination that these functions have ceased, the occurrence of death may be determined where there is the irreversible cessation of the functioning of the entire brain, including the brain stem, determined in accordance with this section.
§ 382.009(1), Fla.Stat. (1991) (emphasis added). A later subsection goes on to declare:
Except for a diagnosis of brain death, the standard set forth in this section is not the exclusive standard for determining death or for the withdrawal of life-support systems.
§ 382.009(4), Fla.Stat. (1991). This language is highly significant for two reasons.
First, the statute does not purport to codify the common law standard applied in some other jurisdictions, as does the uniform act. The use of the permissive word “may” in the statute in tandem with the savings clause of section 382.009(4) buttresses the conclusion that the legislature envisioned other ways of defining “death.” Second, the statutory framers clearly did not intend to apply the statute’s language to the anencephalic infant not being kept alive by life support. To the contrary, the framers expressly limited the statute to that situation in which “respiratory and circulatory functions are maintained by artificial means of support.”
There are a few Florida authorities that have addressed the definitions of “life” and “death” in somewhat analogous though factually distinguishable contexts. Florida’s Vital Statistics Act, for example, defines “live birth” as
the complete expulsion or extraction of a product of human conception from its mother, irrespective of the duration of pregnancy, which, after such expulsion, breathes or shows any other evidence of life such as beating of the heart, pulsation of the umbilical cord, and definite movement of the voluntary muscles, whether or not the umbilical cord has been cut or the placenta is attached.
*593 § 382.002(10), Fla.Stat. (1991). Conversely, “fetal death” is defined as
death prior to the complete expulsion or extraction of a product of human conception from its mother if the 20th week of gestation has been reached and the death is indicated by the fact that after such expulsion or extraction the fetus does not breathe or show any other evidence of life such as beating of the heart, pulsation of the umbilical cord, or definite movement of voluntary muscles.
§ 382.002(7), Fla.Stat. (1991). From these definitions, it is clear that T.A.C.P. was a“live birth” and not a “fetal death,” at' least for purposes of the collection of vital statistics in Florida. These definitions obviously are inapplicable to the issues at hand today, but they do shed some light on the Florida legislature’s thoughts regarding a definition of “life” and “death.”
Similarly, an analogous (if distinguishable) problem has arisen in Florida tort law. In cases alleging wrongful death, our courts have held that fetuses are not “persons” and are not “born alive” until they acquire an existence separate and independent from the mother. E.g., Duncan v. Flynn, 358 So.2d 178, 178-79 (Fla.1978). We believe the weight of the evidence supports the conclusion that T.A.C.P. was “alive” in this sense because she was separated from the womb, and was capable of breathing and maintaining a heartbeat independently of her mother’s body for some duration of time thereafter. Once again, however, this conclusion arises from law that is only analogous and is not dispositive of the issue at hand.
We also note that the 1988 Florida Legislature considered a bill that would have defined “death” to include anencephaly. Fla.H.B. 1089 (1988). The bill died in committee. While the failure of legislation in committee does not establish legislative intent, it nevertheless supports the conclusion that as recently as 1988 no consensus existed among Florida’s lawmakers regarding the issue we confront today.
The parties have cited to no authorities directly dealing with the question of whether anencephalics are “alive” or “dead.” Our own research has disclosed no other federal or Florida law or precedent arguably on point or applicable by analogy.[9] We thus are led to the conclusion that no legal authority binding upon this Court has decided whether an anencephalic child is alive for purposes of organ donation. In the absence of applicable legal authority, this Court must weigh and consider the public policy considerations at stake here.

IV. Common Law & Policy

Initially, we must start by recognizing that section 382.009, Florida Statutes (1991), provides a method for determining death in those cases in which a person’s respiratory and circulatory functions are maintained artificially. § 382.-009(4), Fla.Stat. (1991). Likewise, we agree that a cardiopulmonary definition of death must be accepted in Florida as a matter of our common law, applicable whenever section 382.009 does not govern. Thus, if cardiopulmonary function is not being maintained artificially as stated in section 382.009, a person is dead who has sustained irreversible cessation of circulatory and respiratory functions as determined in accordance with accepted medical stan *594 dards.[10] We have found no credible authority arguing that this definition is inconsistent with the existence of death, and we therefore need not labor the point further.
The question remaining is whether there is good reason in public policy for this Court to create an additional common law standard applicable to anencephalics. Alterations of the common law, while rarely entertained or allowed, are within this Court’s prerogative. E.g., Hoffman v. Jones, 280 So.2d 431 (Fla.1973). However, the rule we follow is that the common law will not be altered or expanded unless demanded by public necessity, Coastal Petroleum Co. v. Mobil Oil Corp., 583 So.2d 1022, 1025 (Fla.1991), or where required to vindicate fundamental rights. Haag v. State, 591 So.2d 614, 618 (Fla.1992). We believe, for example, that our adoption of the cardiopulmonary definition of death today is required by public necessity and, in any event, merely formalizes what has been the common practice in this state for well over a century.
Such is not the case with petitioners’ request. Our review of the medical, ethical, and legal literature on anencephaly discloses absolutely no consensus that public necessity or fundamental rights will be better served by granting this request.
We are not persuaded that a public necessity exists to justify this action, in light of the other factors in this case — although we acknowledge much ambivalence about this particular question. We have been deeply touched by the altruism and unquestioned motives of the parents of T.A.C.P. The parents have shown great humanity, compassion, and concern for others. The problem we as a Court must face, however, is that the medical literature shows unresolved controversy over the extent to which anencephalic organs can or should be used in transplants.
There is an unquestioned need for trans-plantable infant organs. See Kathleen L. Paliokas, Anencephalic Newborns as Organ Donors: An Assessment of “Death” and Legislative Policy, 31 Wm. & Mary L.Rev. 197, 238-39 (1989); Andrea K. Scott, Death Unto Life: Anencephalic Infants as Organ Donors, 74 Va.L.Rev. 1527, 1531-32 (1988). Yet some medical commentators suggest that the organs of anen-cephalics are seldom usable, for a variety of reasons, and that so few organ transplants will be possible from anencephalics as to render the enterprise questionable in light of the ethical problems at stake — even if legal restrictions were lifted. D. Alan Shewmon et al., The Use of Anencephalic Infants as Organ Sources, 261 JAMA 1773, 1774-75 (1989).
Others note that prenatal screening now is substantially reducing the number of anencephalics born each year in the United States and that, consequently, anencephal-ics are unlikely to be a significant source of organs as time passes. Shlomo Shinnar et al., Ethical Issues in the Use of Anencephalic Infants as Organ Donors, 7 Ethical Issues in Neurologic Practice 729, 741 (1989). And still others have frankly acknowledged that there is no consensus and that redefinition of death in this context should await the emergence of a consensus. Norman Fost, Removing Organs from Anencephalic Infants: Ethical and Legal Considerations, 16 Neonatal Neurology 331, 336 (1989). But see Charles N. Rock, The Living Dead: Anencephaly and Organ Donation, 7 J.Hum.Rts. 243, 276-77 (1989) (arguing a consensus may be developing).
A presidential commission in 1981 urged strict adherence to the Uniform Determination of Death Act’s definition, which would preclude equating anencephaly with death. President’s Commission for the Study of Ethical Problems in Medicine, Biomedical, and Behavioral Research, Defining Death: Medical, Legal and Ethical Issues in the Determination of Death 2 (1981). Several sections of the American Bar Association have reached much the same conclusion. National Conference on Birth, Death, and Law, Report on Conference, 29 Jurime- *595 tries J. 403, 421 (Lori B. Andrews et al. eds. 1989).
Some legal commentators have argued that treating anencephalics as dead equates them with “nonpersons,” presenting a “slippery slope” problem with regard to all other persons who lack cognition for whatever reason. Debra H. Berger, The Infant with Anencephaly: Moral and Legal Dilemmas, 5 Issues in L. & Med. 67, 84-85 (1989). Others have quoted physicians involved in infant-organ transplants as stating, “[T]he slippery slope is real,” because some physicians have proposed transplants from infants with defects less severe than anencephaly. Beth Brandon, Anencephalic Infants as Organ Donors: A Question of lAfe or Death, 40 Case Western L.Rev. 781, 802 (1989-90).
We express no opinion today about who is right and who is wrong on these issues— if any “right” or “wrong” can be found here. The salient point is that no consensus exists as to: (a) the utility of organ transplants of the type at issue here; (b) the ethical issues involved; or (c) the legal and constitutional problems implicated.

V Conclusions

Accordingly, we find no basis to expand the common law to equate anencephaly with death. We acknowledge the possibility that some infants’ lives might be saved by using organs from anencephalics who do not meet the traditional definition of “death” we reaffirm today. But weighed against this is the utter lack of consensus, and the questions about the overall utility of such organ donations. The scales clearly tip in favor of not extending the common law in this instance.
To summarize: We hold that Florida common law recognizes the cardiopulmonary definition of death as stated above; and Florida statutes create a “whole-brain death” exception applicable whenever cardiopulmonary function is being maintained artificially. There are no other legal standards for determining death under present Florida law.
Because no Florida statute applies to the present case, the determination of death in this instance must be judged against the common law cardiopulmonary standard. The evidence shows that T.A.C.P.’s heart was beating and she was breathing at the times in question. Accordingly, she was not dead under Florida law, and no donation of her organs would have been legal. § 732.912, Fla.Stat. (1991). The trial court reached the correct result, although we do not agree with its determination that section 382.009 applied here. We answer the question posed by this case in the negative and approve the result reached below.
It is so ordered.
BARKETT, C.J., and OVERTON, McDonald, SHAW, GRIMES and HARDING, JJ., concur.

. Some of the parties incorrectly argue that the district court certified specific questions. In actuality, the district court’s order did not certify specific questions. We therefore frame the issue ourselves.

. Although the child died during the pendency of this appeal, we exercise our inherent jurisdiction to take the case because it is an issue of great importance capable of repetition yet evading review. Holly v. Auld, 450 So.2d 217 (Fla.1984).

. We are mindful that some parties argue that anencephaly is not invariably fatal and that some anencephalics actually live for many years. We find that this argument arises from a misperception about the nature of anencephaly as it is defined by a consensus in the medical community. The living children described by the parties actually are not anencephalic, because they do not meet the definitive medical criteria. These medical criteria are discussed below.

.There was some dispute about this point. Our resolution of the case, however, renders the dispute moot.

. The term "anencephaly” most commonly is used to identify this particular kind of birth defect. More rarely, the term "anencephalus” is used.

. The statement also was approved by the American Academy of Pediatrics, the American Academy of Neurology, the American College of Obstetricians and Gynecologists, the American Neurological Association, and the Child Neurology Society. David A. Stumpf et al., The Infant with Anencephaly, 322 New Eng.J.Med. 669, 669 n* (1990).

. We have found no English cases prior to July 4, 1776, that established a common law definition of "death” imported into our own common law by operation of section 2.01, Florida Statutes (1991). The parties cite to none, and our own independent research has revealed none.

. Black’s Dictionary subsequently has modified its definition. See Black’s Law Dictionary 400 (6th ed. 1991).

. Some of the parties and amici cite to various other laws establishing civil rights for disabled persons, including section 504 of the federal Rehabilitation Act and the federal Americans with Disabilities Act. We are aware that analogous Florida laws also exist. It is evident, however, that these laws do not apply to the dead. Accordingly, the linchpin question remains whether or not T.A.C.P. was dead at the times in question. We also are not persuaded that Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), limited on other grounds, Webster v. Reproductive Health Servs., 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989), modified on other grounds, Planned Parenthood of Southeastern Pennsylvania v. Casey, — U.S. -, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), has any applicability to the facts at hand. By its own terms, Roe did not attempt to "resolve the difficult question of when life begins.” Id. 410 U.S. at 159, 93 S.Ct. at 730. We also do not agree that a parental right of privacy is implicated here, because privacy does not give parents the right to donate the organs of a child born alive who is not yet legally dead. Art. I, § 23, Fla. Const.

. Adoption of this common law definition essentially brings Florida into harmony with the Uniform Determination of Death Act, which embodies the same two standards contained separately in our common law definition and in section 382.009, Florida Statutes (1991).